THE STATE OF OHIO, APPELLEE, *v.* KEATON, APPELLANT.

[Cite as State v. Keaton, 9 Ohio App. 2d 139.]

140

(No. 250—Decided February 3, 1967.)

Mr. *Robert H. Huffer*, prosecuting attorney, and *Mr. Charles W. Wilburn*, for appellee.
Mr. *Emanuel Nadlin*, for appellant.

GRAY, J.  This is an appeal from two judgments of the Court of Common Pleas of Pickaway County, wherein defendant was adjudged guilty of premeditated murder, with a recommendation of mercy and of killing another in the perpetration of a robbery.  The jury withheld recommendation of mercy in its verdict on the latter count.

The trial court, on motion of defendant, refused to reduce the penalties imposed, overruled a motion for a new trial, and sentenced the defendant to life imprisonment on the first count and imposed the death penalty on the second.

Defendant, feeling aggrieved by the judgments of the trial court, filed his notice of appeal and assigned as errors the following:

"I. The trial court abused its discretion in failing to impanel a jury to inquire into the sanity of defendant.  [Section] 2945.37 [Revised Code.]

"II. The trial court abused its discretion by not appointing three disinterested qualified physicians, specialists in mental diseases to investigate and examine into the condition of the defendant and testify as experts at his trial. [Section] 2945.40 [Revised Code.]

"III. Erred in not granting a new trial because defendant has proved insanity by a preponderance and the jury failing to so find, said verdicts are against the weight of the evidence and contrary to law.

"IV. Erred in not granting a new trial because of the surprise change of testimony of the court psychiatrist Dr. Reshetylo.

"V. The trial court failed to direct a verdict at the close of opening statements (R 42) at the close of the state's case R 258 R 263 and at the close of all the evidence (R 518).

"VI. The trial court erred in not modifying the verdicts before passing sentence. [Section] 2945.79 (D) [Revised Code.]

"VII. Erred in not granting a new trial because the verdict is not sustained by sufficient evidence and is contrary to law.

"VIII. The trial court erred in denying defendant a new trial not having had a fair trial because he did not have an impartial juror in No. 4 Juror.

"IX. The following errors of law occurred during the trial:

"1. The trial court refused opinion evidence by Mr. Shapiro.

"2. The trial court refused evidence by Mrs. Hilda Webb in a comparison of defendant with a younger brother duly proffered.

"3. The trial court allowed testimony of Dr. Palmer to go to the jury when it was clear counsel had given no permission for the interview, and in fact had issued written orders to the sheriff that no one talk to the defendant without counsel's permission.

"4. The trial court erred in allowing opinion evidence of Mr. Hopkins re distances from which the gun was fired.

"5. The trial court neglected to charge as a matter of law that there was no direct evidence to prove murder in the first degree.

"X. The trial court erred in not granting motion for new trial for the following irregularities which occurred at the trial by which defendant was prevented from having a fair trial.

"1. The prosecuting attorney held back the second count of murder 1 from the preliminary hearing and thereby deprived defendant of a fair opportunity to inquire into probable cause.

"2. The trial court refused to protect defendant's civil rights; and did not secure to this defendant a fair trial in that he did not require the sheriff who had his custody to protect his civil rights; did not declare a mistrial after it was made clear that defendant's rights to a fair trial and his civil rights were violated by the press, and the court upon such showing did not disqualify himself; held press conferences daily at each recess mid-morning, noon, mid-afternoon and upon adjournment; invoked political overtones and in addition to the complaints set forth in the affidavit of prejudice filed against him gave the Circleville Herald for publication on November 6, 1965 such data as to cause it to state 'The judge indicated the motion if submitted (for new trial) will be overruled' followed by a two page journal entry which he caused to be filed for record less than 10 minutes after 1½ hours argument was concluded, proof that the decision was made to overrule the motion even before made or argued.

"3. The prosecuting attorney argued a theory of the case wholly inconsistent with their opening statement, wholly inconsistent with the evidence and designed only to influence the jury to make a finding of 1st degree murder by premeditation.

"4. The state's witnesses in the person of Mr. Hopkins and Dr. Carroll whose duty was to be objective and fair to the defendant, were prejudicial for the state.

"5. The court's witness reversed himself by trying to explain away his cross-examination to justify his conclusion.

"XI. All other errors manifest in the record prejudicial to defendant."

We come first to assignment of error No. I. We find no error in the refusal of the trial court to impanel a jury to inquire into the sanity of the defendant. This is a discretionary matter on the part of the trial court. Section 2945.37, Revised Code, says in part:

"* * * the court shall proceed to examine into the question

of the sanity or insanity of said person, or in its discretion may impanel a jury for such purpose. * * *"

Defendant, in his brief, did not point out wherein the trial court abused its discretion. We have been unable to find any abuse of discretion, and, therefore, this assignment of error is overruled.

Assignment of error No. II raises the question of whether the trial court abused its discretion in failing to appoint three disinterested, qualified physicians, specialists in mental diseases, to investigate and examine into the mental condition of the defendant. Section 2945.40, Revised Code, states in part:

"* * * The court *may* in such case appoint one or more, but not more than three * * *." (Emphasis added.)

This was discretionary on the part of the trial court. We hold that it did not abuse its discretion.

Defendant failed to show that the action of the trial court in the several particulars complained of constituted an abuse of discretion in that such action was an unreasonable, arbitrary or unconscionable attitude on the part of the court.

We find no error in assignments of error Nos. III, IV, V, VI and VII.

Defendant claims that juror No. 4 was not an impartial juror, which denied him a fair trial in violation of the United States and Ohio Constitutions.

It appears from the record that the wife of juror No. 4 is the first cousin, twice removed, of the prosecuting attorney. On *voir dire* examination, this juror said that he just knew the prosecuting attorney and that was all. Defendant claims this situation created prejudicial error for which he should be granted a new trial.

The prosecuting attorney filed an affidavit stating that he was not acquainted with Everett Welsh (juror No. 4) and had not in fact ever seen him to his knowledge. On *voir dire* examination, juror No. 4 denied any relationship by blood or marriage with the prosecuting attorney.

We believe that the prosecuting attorney and juror No. 4 are equal to their oaths, especially since defendant merely raised the point and has furnished us with no evidence that would disqualify this juror, nor has defendant cited us to any authority for his position.

Section 2945.25, Revised Code, states the grounds for which a juror may be challenged for cause in a criminal case. Subsection (D) reads as follows:

"That he is related within the fifth degree to the person alleged to be injured or attempted to be injured by the offense charged, or to the person on whose complaint the prosecution was instituted; or to the defendant [.]"

The relationship of prosecuting attorney and juror is not mentioned. It should also be noted that the right to challenge a juror does not mean that the juror is disqualified, especially where the juror has been accepted as a juror by counsel and the court.

Defendant's attorney states that he first learned of the relationship just before he started arguing the case to the jury on November 9, 1965. He filed his motion to reconsider on November 24, 1965. He should have brought it to the court's attention immediately. As stated by Mr. Justice Holmes in *Queenan* v. *Oklahoma*, 190 U. S. 548, at 552:

"* * * But if the court's view was wrong, if the statute is constitutional—as to which we do not mean to express a doubt —the prisoner had no right to complain, and if it is not, it was his duty to object at the time if he was going to object at all. He could not speculate on the chances of getting a verdict and then set up that he had not waived his rights."

How could this situation result in prejudicial error when neither one at the time knew of the relationship? A juror cannot be prejudiced by a fact unknown to him.

A U. S. Circuit Court of Appeals stated in *Garland* v. *United States*, 182 F. 2d 801, 802, as follows:

"* * * The argument that the verdict should have been set aside because a sister of one of the jurors was married to an uncle of the Assistant United States Attorney who presented the case is so lacking in all merits as not to justify discussion. It is well settled generally that relationship to the prosecuting attorney does not disqualify a juror." 50 Corpus Juris Secundum 958, Juries, Section 219; 31 American Jurisprudence 663.

The court, in *Brown* v. *United States*, 356 F. 2d 230, said at page 233, that:

"Disruptive consequences to the trial of criminal cases are suggested by permitting defense counsel to come forth after

conviction and successfully contend that, notwithstanding the absence of actual bias, and notwithstanding his own failure sufficiently to pursue *voir dire* inquiry to expose possible predilections on the part of a prospective juror, that nevertheless probable prejudice must be imputed to the juror as a matter of law and a new trial thereafter granted. 'A disqualification which by reasonable diligence could have been discovered before verdict, may not afterwards be made the subject of an attack upon a verdict.' *Spivey* v. *United States*, 5 Cir., 109 F. 2d 181, 186. Cert. denied 310 U. S. 631, 60 S. Ct. 1079, 84 L. Ed. 1401."

See, also, 31 American Jurisprudence 136, Section 156; 24 Corpus Juris Secundum 92, Section 1446(3); *State* v. *Glaros*, 170 Ohio St. 471, 475; *Johnson* v. *State*, 53 Ohio App. 410; *Beck* v. *State*, 20 Ohio St. 228; and *Pearson* v. *Gardner Cartage Co.*, 148 Ohio St. 425.

We hold that this assignment of error lacks merit, and it is, therefore, overruled.

The facts in the record show that defendant, on March 22, 1965, took a 1960 Chrysler automobile in Chillicothe, Ohio, at gunpoint. He drove it over the back roads in Ross and Pickaway Counties; and, in the early morning hours of March 23, 1965, he drove it through a guardrail and fence into a field in Pickaway County. He was unable to extricate the car.

From that point on we only have the defendant's version of the case. The other witness is dead.

Maurice Francis lived near Williamsport, Pickaway County, Ohio. He worked at a General Motors plant in Columbus. His shift ended at 12:30 a. m. Defendant testified that Francis stopped and asked defendant if he could help him in his difficulty. Defendant accepted the offer, and they started to drive toward Williamsport. Francis suggested to defendant that he report his accident. After some discussion, defendant decided he wanted to go back to the scene of the accident. According to defendant, Francis must have seen a gun in the side of defendant's trousers. Francis stopped the car suddenly. Defendant fell forward. The gun worked loose and fell on the front seat. Both men grappled for it. One shot went off. Francis was wounded. Francis asked to be taken to the hospital. Defendant got in the driver's seat and started the automobile. The automobile door flew open, and Francis fell out

on to the road as defendant applied the brakes to stop the automobile in order to close the door. Defendant left Francis along the roadside and departed. The pulmonary arteries were severed by one or more of the bullets, causing massive hemmorhages in the lungs, and death ensued. His body was discovered shortly thereafter by a passerby.

Defendant was apprehended later in Jamestown, Green County, Ohio.

At the time of his arrest defendant told the police officers that he could have shot one or both of them. He was found in the rear seat of Francis' automobile, a 1957 Chevrolet four-door sedan. He had on his person a .22 H & R revolver, fully loaded. The Chevrolet front seat had a great amount of blood on it of the "AB" type which was the blood type of Francis. This is the most rare type of human blood, occurring in only 5 per cent of the population. Human blood of the "AB" type was found on the clothing of defendant.

Fingerprints of defendant were found on the steering wheel of the Chrysler. Powder burn tests were conducted by experts, and these tests revealed that one shot was fired from about two feet from the body of Francis and the remaining two were fired from over three feet away. X-rays revealed three .22 caliber slugs in the body of Francis. It was established by a ballistics expert that the slugs in the body of Francis came from the gun found on the person of defendant when he was apprehended. Defendant did not refute the above evidence.

From the circumstances, facts and inferences therefrom, the theory was advanced by the prosecution that defendant was in need of another automobile because the Chrysler was becoming very "hot." Defendant had been in flight and had been traveling the back roads. When Francis stopped for the road stop sign at the Yankeetown-Dawson Pike, defendant, waiting and concealed near the stop sign, opened the door and fired three shots into the body of Francis then took the body out of the automobile and dumped it alongside the road. Defendant then got in the driver's seat and drove the Chevrolet to Jamestown where he was apprehended.

It is the contention of the prosecution that defendant's claim, that he and Francis were wrestling over the gun, is not consistent with the evidence, due to the fact that there is not

enough room in the front seat of the Chevrolet to have permitted the gun to be two or three feet away from the right side of Francis when it discharged the bullets which killed him. The prosecution maintains that scuffling for the gun would not cause it to go off three times, because it is a double action revolver, and that to fire each shot it is necessary that the trigger be pulled each time.

Defendant entered a plea of not guilty by reason of insanity. He was sent to Lima State Hospital for examination. He was reported to be sane. He then was tried before the Common Pleas Court Judge without a jury on the sanity issue and was found sane.

Defense counsel strenuously urges that defendant is insane and that the trial court committed a grievous error in applying M'Naghten's Rule. The prosecution requested that only the tests pertaining to insanity enunciated in M'Naghten's Rule be given by the court in its general charge, but was unsuccessful. In any event the question whether defendant knew right from wrong was put to the psychiatrists. This court is well aware that the application of this rule has been condemned by some courts. The Supreme Court of Ohio has laid down the rule to follow in *State* v. *Stewart*, 176 Ohio St. 156, and we are bound to follow it. The United States Supreme Court denied certiorari in this case (379 U. S. 947). See, also, *Krauter* v. *Maxwell, Warden*, 3 Ohio St. 2d 142. This we now do in overruling this assignment of error. Furthermore, defendant did not make timely objection to the question propounded to the doctors concerning the application of the rule enunciated by the Supreme Court, and, hence, did not preserve the question. There is, therefore, nothing before this court to review.

We have read the testimony of the three psychiatrists, and we are unable to find where any one of them said that defendant did not know right from wrong at the time the offense was committed. The psychiatrist, Dr. Mahmud T. Faruiki, called by the defense, refused to give an opinion as to whether defendant knew right from wrong. He further stated that he wanted to leave this matter to the jury.

Dr. Dwight Palmer testified that defendant was oriented as to time, place and person. He testified further that defendant was not feeble minded, that there was no evidence of neu-

roses or psychoneuroses, and that he was not psychotic. Dr. Palmer's diagnosis of defendant is that he is a sociopathic personality with antisocial reactions. Dr. Palmer testified further that, in simple terms, a sociopath is an individual who is oriented and not insane and who is lacking in the ethical and social values of society. Defendant claims that he suffered an injury to his head when he was a baby, causing brain damage, and that this is a reason for his present psychotic condition. The encephalogram shows his brain to be normal. X-rays show no skull damage. Dr. Reshetylo, of Lima State Hospital, testified as follows:

"Q. You have an opinion as to whether or not Cleo Keaton can abjure the wrong? A. He could but he had not done it."

Defendant proclaims that M'Naghten's Rule must die in Ohio, not Cleo Keaton. Frankly, we believe that the issue of the applicability of M'Naghten's Rule to this case has not been presented. Both the prosecution and defense went far beyond the confines of this rule in the presentation of their cases, as did the trial court in its charge to the jury. Such action benefitted defendant, and he should not be heard to complain now. Defendant urges the rule promulgated by the American Law Institute be adopted and used in Ohio. This rule is as follows. Section 4.01, Model Penal Code, states:

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law."

But the second clause of Section 4.01 explicitly states that: "the terms 'mental disease or defect' do not include an abnormality *manifested only by repeated criminal or otherwise anti-social conduct.*" (Emphasis added.)

Defendant was permitted to ask any question he desired of the three psychiatrists, and no objection was taken. He was given free rein. If he failed to develop points in support of his contentions that is not a matter this court can review.

Defendant did not request any special instructions before argument, nor did he request the court to amplify the general charge in any way.

We have examined the court's charge on the issue of in-

sanity. We think that it is very favorable to defendant. He must have thought so too as he did not request the court to modify it or make any additions or corrections. The defendant only took a general exception to the charge as given.

The trial court's charge on insanity is in part as follows: "* * * The test of insanity is this: First, was the mind of the defendant deranged or diseased from some cause to such an extent that the criminal act was the product of the defendant's deranged or diseased mind. And second was the defendant's mental capacity so impaired that he did not understand the nature and quality of the act he was doing or that he did not know that it was wrong to commit it. Or stated another way was the mind of the defendant deranged or diseased from some cause to such an extent that he was not a free agent in forming the intent, malice or purpose to commit the criminal act or to such an extent that he lacked the mental ability to choose the right and reject the wrong in relation to that act. You may also consider whether he knew or was capable of knowing that such act was contrary to the laws of God and of man. Insanity may be of short or of long duration. The test for insanity remains the same irrespective of its duration. Only to this extent does the law recognize temporary insanity. * * *"

We have compared the court's charge with the "rule" promulgated by the American Law Institute, which is supposed to be the latest development on this subject, and we believe that the trial court's charge was the more favorable to the defendant of the two.

We fail to see the basis for defendant's objection on that point.

The U. S. Court of Appeals for the Eighth Circuit, in *Dusky* v. *United States*, 295 F. 2d 743 (certiorari denied, 368 U. S. 998), analyzed the problem as follows at page 759: "* * * and henceforth we would be loath, indeed, to reverse where, as here, the trial court has used instructions, whether based theoretically on a M'Naghten variation or on the test set forth in the Modern [*sic*] Penal Code proposed by the American Law Institute or on that form revised as suggested by the Third Circuit in Currens, or whether couched in still other language, *if* the charge appropriately embraces and requires positive findings as to 3 necessary elements, namely, the defendant's

*cognition,* his *volition,* and his *capacity* to *control* his behavior. If those 3 elements—knowledge, will and choice—are emphasized in the court's charge as essential constituents of the defendant's legal sanity, we suspect that the exact wording of the charge and the actual name of the test are comparatively unimportant and may well be little more than an indulgence in semantics. We think this approach to be sound because it preserves and builds upon those elements of M'Naghten and of irresistible impulse which are acceptable in these days and yet modernizes them in terms which a jury can grasp and apply."

We believe the trial court's charge met the tests of the federal courts.

The jury is the sole arbiter of the facts. As long as there is some credible evidence upon which it can base its verdict that verdict must remain undisturbed. The jury rejected defendant's plea of not guilty by reason of insanity. We can find no fault with this decision of the jury.

The cross-examination of defendant consumes 66 pages of the record. Upon reading it we were impressed with the ability of defendant to avoid making damaging admissions and in his ability to parry questions, the answers to which were fraught with danger to him. There is evidence that defendant had an I. Q. of 77. He might have an I. Q. of 77, but we are certain that this does not accurately measure the wordly wisdom of this man. As an example, on several occasions during the trial he corrected his counsel as to facts, and on other occasions he interrupted the proceedings with advice to his counsel.

Some questions naturally arise. Why was defendant carrying a gun? Why did he shoot Francis three times when they were supposedly scuffling for possession of the gun? If it were an accident, why were there three shots? Why didn't defendant report Francis accidentally shot? Why did he hurriedly depart from the scene, if the shots were accidental? Why didn't he take Francis to the hospital?

Defendant takes deep umbrage due to the fact that there was no direct evidence on all material elements of the crime with which he was charged.

The use of circumstantial evidence is permitted because it is capable of producing the highest degree of moral certainty. This is no doubt due to the fact that crimes of any magnitude are rarely committed without affording vestiges by which the

offender may be traced, and very often the means he adopts for his security turn out to be the most cogent argument of his guilt. See *Hess* v. *State*, 5 Ohio 5, 10. So it is in the present case.

Evidence is none the less effective because it is circumstantial if it be consistent, connected and conclusive. It must be remembered that the large portion of this case is proved by direct evidence.

Circumstantial evidence of probative value is the handmaiden of truth. In this case it placed defendant between the two horns of his dilemma. He could choose to paint himself an unlovely creature who in a scuffle mortally wounded a Good Samaritan, dumped his body along the roadside and left him there to die; or, he could admit that he waited in the darkness near the road stop sign where Francis had to stop and then opened the automobile door and fired three shots into the body of Francis before Francis knew what had happened. He chose the former version. The spacing and position of the shots in the body of Francis do not sustain the testimony of defendant that a wild melee occurred when he and Francis fought for possession of the gun. The bullets were not indiscriminately sprayed over the interior of the car. Not one missed its mark. The topmost wound in the right side of the body of Francis matches a single bullet hole in the right side of the jacket of Francis. The middle wound in the right side of Francis, five inches below and in a vertical line with the top wound, matches up with a bullet hole in the breast of the jacket and holes in each of two folds of the right sleeve of the jacket of Francis. The lowest wound on the body of Francis was about 3½ inches lower than the middle wound. It was in a vertical line with the other two wounds. This latter wound matches a hole in the jacket and two holes in either side of the lower right sleeve of the jacket worn by Francis. If Francis and defendant had been scuffling for the gun as defendant claims, the bullet holes in the body of Francis would have been in the front of his body and not in his right side.

These facts, in our opinion, conclusively prove that Francis had his right hand down at his side and in a position of repose, probably on the steering wheel, when he was shot, and that he could not have been scuffling for the gun.

It is difficult for this court to perceive how Francis could

discern a gun tucked in the trousers of defendant in the darkness in the early morning hours of March 23, 1965.

It should be further noted that, in his opening statement, defendant's attorney talked of only one shot. Defendant testified that he fired one shot and that if there were more he didn't remember them. Generally it may be said that for every thrust of evidence in a trial there is a counterthrust. When this defendant testified he didn't remember more than one shot, he thereby precluded any further explanation on his part of the other two shots. We believe that he made a conscious choice.

It can readily be inferred that defendant thought he might have a good explanation for one shot but not for the other two. The first might have been an accident, but two other shots from a double-action revolver which requires that the trigger be pulled before each shot is discharged cannot be classed as two more accidents.

The photographs of Francis' body and the X-rays clearly show that three bullets entered his body. The nitrate tests show the one shot was fired from at least two feet away. Obviously, the jury did not believe defendant's version of the events. That was its province. There was ample evidence upon which the jury could base its verdict.

Defendant strongly urges that the trial court should have directed a verdict at the conclusion of the state's evidence and again at the conclusion of the case. This assignment of error is without merit.

When the evidence in a criminal case tends to sustain all the essential elements charged in the indictment, it is error for the trial court to withdraw the case from the jury and discharge the defendant. *State* v. *Axe*, 118 Ohio St. 514; *State* v. *Shively*, 172 Ohio St. 128, 132; *Painesville Utopia Theatre Co.* v. *Lautermilch*, 118 Ohio St. 167; *Cooper* v. *State*, 121 Ohio St. 562.

Section 2945.59, Revised Code, provides:

"In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior

or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

At approximately 6:15 in the evening of March 22, 1965, defendant took a Chrysler automobile at gunpoint from a Miss Maynard at a parking lot in a shopping center in Chillicothe. This time was approximately seven hours before Francis was shot to death and defendant drove away with Francis' automobile. The evidence concerning the taking of the Chrysler could well have dispelled in the minds of the jury the truthfulness of the version of the facts as related by defendant concerning the death of Francis.

It must be remembered that defendant has much at stake in the outcome of his trial and appeal. He can be expected to color the facts to his benefit, especially when there is no living witness to refute his version of the facts. There is more than ample evidence to have taken the case to the jury and to sustain the verdict reached by it.

Defendant contends that the verdict of the jury in not finding defendant insane was against the weight of the evidence. Again, this is a matter for the determination of the jury. See cases above cited.

An anomalous position has been taken by the defendant. He is urging as an error the fact that the trial court found him sane without the intervention of a jury. He has asked the trial court, and now is asking this court, to find, as a matter of law, that he is insane after a jury, requested by defendant for a trial on the merits, has found him sane.

No defendant has the right to control the discretion of a trial judge in his choice of mechanisms provided for the trial of the defendant. He cannot successfully insist on some procedure that he thinks would give him a better chance of acquittal.

Another error being urged by defendant is that the trial court failed to direct a verdict after the prosecuting attorney made his opening statement. This question has been answered in the case of *State* v. *Karcher*, 155 Ohio St. 253:

"1. Where, in a criminal proceeding, the state's statement of its case indicates that the accused was charged with the offense for which he is being tried and there is no admission of

fact showing that no offense was committed or that the accused was not guilty of the offense charged, a motion by the accused for judgment on such statement should be overruled.''

This assignment of error is not well taken.

Defendant is highly critical of the procedure wherein the prosecuting attorney had Dr. Palmer, a psychiatrist, examine defendant when Mr. Nadlin had instructed the Sheriff not to permit such examination. Let us look at the record. Defendant entered his plea of not guilty by reason of insanity, which set this facet of the case in motion. He was examined by Dr. Faruiki who was employed by defendant. The trial court sent defendant to the Lima State Hospital for examination, which was had. Defendant objects to any other examination. Defendant told Dr. Palmer, during the examination complained of, that he was not going to discuss any facts concerning the alleged murder. He didn't.

Section 2945.40, Revised Code, states in part:

''* * * The appointment of such expert witnesses, and their testifying as witnesses, shall not preclude *the prosecuting attorney or defendant* from calling other witnesses to testify on the subject of insanity. * * *'' (Emphasis added.)

From the record it appears that there was no compulsion, neither was there any coercion, to compel defendant to be examined by Dr. Palmer.

We know of no authority whereby a defendant is entitled to choose the psychiatrists who will examine him. Neither has defendant cited us to any authority for such a position. He was given free rein in his cross-examination of this psychiatrist, and, if he thought there was any bias or prejudice, he had full opportunity to develop it. Defendant voluntarily submitted to this examination. He understood the nature and purpose of it, and during it he conducted himself in a rational manner.

This contention of defendant is totally lacking in merit. No prejudice resulted to defendant in this instance.

Defendant and his attorney voluntarily introduced into the record that defendant had committed murder at will, that he had committed armed robbery at will, and that he had kidnapped two people. He further amplified these admissions that he had committed 20 armed robberies. In his opening statement, defendant's counsel stated that on March 15, 1965, defendant

was involved in three other shootings, as a result of which two people died and one recovered.

Defendant and his counsel took a calculated risk when they adopted such tactics. The jury apparently wasn't influenced by such evidence to cause it to find defendant insane. On the other hand, it is evident that such admissions did not endear defendant in the hearts of the triers of the facts.

Section 2945.83, Revised Code, reads in part as follows:

"No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court because of:

"* * *

"(E) Any other cause unless it appears affirmatively from the record that the accused was prejudiced thereby or was prevented from having a fair trial."

Upon the whole record, let it be said that in this case there was good police work, good prosecution, a fair and impartial judge and, finally, that defendant's attorney gave this case his total effort.

"Defendant is entitled to a fair trial but not a perfect one." *Lutwak* v. *United States,* 344 U. S. 604, rehearing denied, 344 U. S. 919. Defendant, Cleo Keaton, received a fair trial. We have examined all other claimed errors assigned and fine none well taken.

*Judgments affirmed.*

BROWN, P. J., and CARLISLE, J., concur.