CITY OF COLUMBUS v. ZANDERS.

[Cite as Columbus v. Zanders (1970), 25 Ohio Misc. 144.]

(No. 31436—Decided October 13, 1970.)

Franklin County Municipal Court.

*Mr. John Steinhauer,* for plaintiff.
*Mr. Paul Scott,* for defendant.

JENKINS, J.   Defendant herein was arrested, charged and tried under Section 2343.04 of the Columbus Municipal Code which reads as follows:

"No person shall appear upon any public street or other public place in a state of nudity or in a dress not belonging to his or her sex, or in an indecent or lewd dress."

The stipulated testimony of the arresting officers was that on December 10, 1969, defendant was apprehended wearing woman's clothing and make-up and impersonating a female in violation of the aforementioned ordinance.

Dr. Byron Stinson, chairman of the Department of Psychiatry Transsexual Protocol Committee of the Ohio State University Hospital, testified that he has had contact with and examined the defendant, as have two other members of his staff, for a period of a year and a half, including a period of six weeks as an in-patient in Upham Hall for a study for a prospective transsexual operation.

The results of the psychiatric examinations, the social and emotional testing, indicate strongly that the defendant was a true transsexual; he scoring very high on the feminine scale.   The doctor indicated that he was a prime candidate for transsexual surgery.

The doctor revealed further that the defendant feels as a female, has no emotional investment in his male sex organs and he feels that he is a female trapped in a male body belonging to someone else.   His attraction sensually is to males without the desire for the abnormal sexual contact of a homosexual, and dressing as a woman does not engender any erotic sexual stimulations but, on the contrary, causes him to feel natural and normal.

The testimony of the doctor indicated quite clearly that he and his staff approached his problem with extreme caution.   Of course, there has been a year and a half of

contact with six weeks of in-patient study. They plan to keep the defendant on female hormones for a period of six months and it is desirable that defendant dress and otherwise identify as a woman for a period of a year before submitting to surgery.

At the time of arrest defendant had been on female hormones for a period of a month and, as the doctor indicated, in the defendant this matter of dressing as a woman is a compulsion. The matter of his being transformed into a woman is a matter of psychotherapy.

The experience of John Hopkins University with some 2,000 patients indicated that the change made for better psychological emotional and social adjustment in these people.

Defendant's counsel argue that the ordinance in question is contrary to the guarantees of the United States Constitution being a deprivation of a right of expression guaranteed by the First Amendment, a deprivation of the right of privacy guaranteed by the Fourth Amendment, a deprivation of due process guaranteed by the Fifth Amendment and constitutes cruel and unusual punishment contrary to the Eighth Amendment as applied to the due process clause of the Fourteenth Amendment, and cite *State v. Betts*, 21 Ohio Misc. 175; *Youngstown v. Kahn Building Co.*, 112 Ohio St. 654, and *Lawton v. Steel*, 152 U. S. 133, in support of this theory.

The question then presents itself, does Section 2343.04 of the Columbus City Code bear a real and substantial relation to the public health, safety, morals or general welfare? Is there a public need for such regulation?

The law in this area has been well stated by the Ohio Supreme Court when it held that "Laws or ordinances passed by virtue of the police power which limit or abrogate constitutionally guaranteed rights must not be arbitrary, discriminatory, capricious or unreasonable and must bear a real and substantial relation to the object sought to be obtained, namely, the health, safety, morals or general welfare of the public." *Cincinnati v. Correll*, 141 Ohio St. 535. See, also, *Froelich v. Cleveland*, 99 Ohio St. 376, and *Youngstown v. Kahn Bldg. Co.*, 112 Ohio St. 654.

Defendant asks this court to declare the ordinance unconstitutional inasmuch as it prevents him from "doing his own thing" in the vernacular of the "pepsi generation." It is apparent in this day and age that the entire philosophic concept of public morals, religion, ethical values, and rules of decency has undergone a substantial change. We are not unmindful of the early critics of the Puritan Ethic, and the wit and humor of Artemus Ward who stated, "The Puritans nobly fled from a land of despotism to a land of freedom, where they could not only enjoy their own religion, but could prevent everybody else from enjoying his." In spite of changing times and morals, common sense and experience discloses that this ordinance has a real and substantial relation to the public safety and general welfare. There are numerous subjects who would want to change their sex identity in order to perpetrate crimes of homicide, rape, robbery, assault, etc. We hold, therefore, that Section 2343.04 of the Columbus City Code has a real and substantial relation to the public safety and is therefore constitutional and a valid exercise of the police power.

We next consider defendant's argument that the provisions of this ordinance must not be applied to him by reason of his medical and psychological problem as a transsexual. We believe this to be a case of first impression within this state.

Attention is invited to an outstanding article by Dr. Harry Benjamin of New York who wrote in the American Journal of Psycotherapy 1963, at pages 460, 461, 462 and 465:

"Transsexuals are unique in their reversed gender role and in the disharmony of their total sexual sense. Many transsexual men feel that they are women in male bodies. The more sophisticated ones know better but like the idea. Frequently they abhor their sex organs which are to them a deformity. They want them altered by surgery in order to live permanently as women, sexually, socially, and legally. This desire for an operation constitutes a foremost differential diagnostic point between transvestism and transsexualism.

''* * *

''Transsexuals are rare in number but are among the most unhappy people I have ever met. The lack of understanding, sympathy, and help they receive from the medical profession generally, aggravates their problems enormously and may indeed j stify my description of them as 'stepchildren of medicine.' They are often in a stage of depression and on the verge of self-mutilation or suicide. Many of us may never have seen or talked to a transsexual patient, but we will probably all remember Christine Jorgensen who was a most miserable young man 12 years ago, who succeeded in having a socalled 'conversion operation' performed, and is now a reasonably happy, successful and attractive 'woman' in 'her' late thirties.

''* * *

''*In most male patients, the first symptoms developed 'as early as I can remember.' Eighty-five percent said so.* They felt themselves to be girls and despised the roughness in other boys * * *.

''Libido was exclusively directed toward members of their own sex, but it is typical of many of these patients that they reject being called homosexual. Generally they do not like the 'gay' life and cannot adjust to it. Since they feel like women, it appears 'normal' to them to be attracted to men. Often they dislike homosexuals as well as transvestites and can be very intolerant toward them. This is equally true vice versa. The intolerance of some transvestites seems to show that they too may harbor the germ of transsexualism in themselves against which they seek protection.

''Occasionally, transsexuals live as women even before any operation. They assume female names, dress and work as women, and even enter into illegitimate marriages, always fearful of discovery. Others go in for prostitution, sometimes as male hustlers, but more often as 'female' prostitutes, cleverly hiding their male anatomy. Prostitution not only allows them to make their living and save money for the operation, but being so fully accepted as women by normal men also gives them immense satisfaction.

"The desire for feminization induces most transsexual men to have their beards removed by electrolysis. Some have plastic facial operation, especially 'nose bobs,' to appear more feminine and their breasts enlarged by various methods of hormonal (estrogen) treatment does not produce a sufficient degree of gynecomastia. The energy and perseverance to accomplish all this is often truly astonishing.

"* * *

"The legal motive is strong in all transsexuals. They want a change of their legal status. Red tape is their worst enemy. Their constant fear of discovery, arrest, and prosecution, makes life miserable for them before the operation, and even afterwards they have to fight for the necessary legal changes.

"The social problem is strong in those who, as men, are embarrassed by their conspicuous feminine physique and appearance. They are constantly subject to slighting remarks, knowing looks, and difficulty in securing jobs. As women, they are completely unremarkable, often strikingly attractive and successful. It was sometimes awkward to have these feminine-looking boys come to my office in male attire. But to ask them to come dressed as girls would have meant breaking a law. *This type of law, unfortunately, allows no application of common sense—only a literal interpretation of a statute that was formulated without knowledge of this particular subject.*" (Emphasis added.)

See also Femade Psychosexual Inversion: Transsexualism by Dr. I. B. Pauly, presented at the 11th annual meeting of the American Psychiatric Association May 19, 1963, and Transvestism by Dr. C. Hamburger and others in Journal of the American Medical Association 152:391—1953.

It is apparent from the medical authorities cited that the true transsexual suffers from a mental defect over which he has little practical control. In the instant case defendant's course of conduct in dressing and posing as a female is more the result of an irresistible impulse or a loss of will power than a deliberate act or violation of the

provisions of the ordinance in question. In this area the American Law Institute has long urged a uniform adoption by the states of Section 401 of the Model Penal Code, which reads:

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law."

An accused is not criminally responsible if his unlawful act is the product of a mental disease or a mental defect. Criminal responsibility attaches to those who, of their own free will and with evil intent (sometimes called *mens rea*), commit acts which violate the law. On the facts of this case we cannot hold defendant criminally liable and therefore the charges brought against him are hereby dismissed.

For an interesting decision and annotation relative to criminal responsibility in mental defect situations see *Durham* v. *United States,* 94 App. D. C. 228, 214 F. 2d 862, 45 A. L. R. 2d 1430, and *State* v. *Keaton,* 9 Ohio App. 2d 139.

We are not required and lack jurisdiction to determine defendant's legal rights relative to the operation which he seeks in order to change his sex. The only recorded case we can find in this area is that of *Corbett* v. *Corbett* (a. k. a. Ashley) decided by the Honourable Mr. Justice Ormrod, of the Royal Court of Justice of London, England, in March of 1970. Miss Ashley, 35, was born George Jamieson and underwent a sex change operation in Spain in 1960. Justice Ormrod held that she is "not a woman for the purpose of marriage but is a biological male and has been since birth." As a result, Arthur Cameron Corbett, 50, was granted a declaration that his 1963 marriage to Miss Ashley was void *ab initio.*

In light of the facts and authorities cited herein, the case against this defendant is hereby dismissed.

*Case dismissed.*