DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal is from the November 4, 1999 judgment of the Lucas County Court of Common Pleas which sentenced appellant, Troy Matthew Tenace, to death, following his conviction of aggravated murder, and to incarceration for 10 to 25 years, following his conviction of aggravated robbery. Upon consideration of the assignments of error, we affirm the decision of the lower court.
Appellant was indicted on February 9, 1994 with one count of aggravated murder, in violation of R.C. 2903.01(B), with a death penalty specification (R.C. 2929.04(A)(7) and R.C. 2941.14) and on one count of aggravated robbery, in violation of R.C. 2911.01(A)(2). Appellant was charged with the killing of an elderly man, Edward Kozlowski, on January 26, 1994. Appellant had performed some handyman work for Mr. Kozlowski earlier in the week. The night of the murder, appellant returned to Mr. Kozlowski's home allegedly to reimburse Mr. Kozlowski because appellant overcharged Mr. Kozlowski.
 {¶ 2} Appellant was first tried in 1997, but his conviction was overturned on appeal. State v. Tenace (1997), 121 Ohio App.3d 702. A second trial was held on September 28 and 29, 1999. The jury found appellant guilty of both counts and of the death penalty specification. On November 4, 1999, the trial court sentenced appellant. Appellant then sought an appeal to this court. The state's request for cross-appeal was denied. On appeal, appellant asserts the following twenty-two assignments of error:
 {¶ 3} "Assignment of Error Number One: The jury erred in concluding that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt and that death is the appropriate sentence.
"Assignment of Error Number Two: The trial court erred in concluding that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt and that death is the appropriate sentence.
 {¶ 4} "Assignment of Error Number Three: The trial court erred in failing to grant the Rule 29 Motion.
 {¶ 5} "Assignment of Error Number Four: The Government's lawyers committed misconduct when one of them told the jury that the coroner would testify that the only reason that this amount of damage was inflicted on this person was to cause his death.
 {¶ 6} "Assignment of Error Number Five: The Government's lawyers committed misconduct when one of them told the jury that the defendant had left the victim to die.
 {¶ 7} "Assignment of Error Number Six: The Government's lawyers committed misconduct when one of them told the jury that the defendant had stomped the neck of the victim.
 {¶ 8} "Assignment of Error Number Seven: The Government's lawyers committed misconduct when one of them told the jury that the defendant had a plan to eliminate the victim.
 {¶ 9} "Assignment of Error Number Eight: The Government's lawyers committed misconduct when one of them told the jury that the victim suffered massive injury.
 {¶ 10} "Assignment of Error Number Nine: The Government's lawyers committed misconduct when they wildly speculated in rebuttal about how the incident happened without any supporting evidence.
"Assignment of Error Number Ten: The Government's lawyers committed misconduct when they repeatedly told the jury that the judge would instruct them that under some circumstances the death penalty was mandatory.
 {¶ 11} "Assignment of Error Number Eleven: The conduct of the defendant's trial lawyers fell below the constitutionally required level when they failed to object to one of the Government lawyers telling the jury that the coroner would testify that the only reason that this amount of damage was inflicted on this person was to cause his death.
 {¶ 12} "Assignment of Error Number Twelve: The conduct of the defendant's trial lawyers fell below the constitutionally required level when they failed to object to one of the Government lawyers telling the jury that the defendant left the victim to die.
 {¶ 13} "Assignment of Error Number Thirteen: The conduct of the defendant's trial lawyers fell below the constitutionally required level when they failed to object to one of the Government lawyers telling the jury that the defendant had stomped the neck of the victim.
 {¶ 14} "Assignment of Error Number Fourteen: The conduct of the defendant's trial lawyers fell below the constitutionally required level when they failed to object to one of the Government lawyers telling the jury that the defendant had a plan to eliminate the victim.
 {¶ 15} "Assignment of Error Number Fifteen: The conduct of the defendant's trial lawyers fell below the constitutionally required level when they failed to object to one of the Government lawyers telling the jury that the victim suffered massive injury.
"Assignment of Error Number Sixteen: The conduct of the defendant's trial lawyers fell below the constitutionally required level when they failed to object to one of the Government lawyers wildly speculated in rebuttal about how the incident happened without any supporting evidence.
 {¶ 16} "Assignment of Error Number Seventeen: The conduct of the defendant's trial lawyers fell below the constitutionally required level when they failed to object to one of the Government lawyers repeatedly telling the jury that the judge would instruct them that under some circumstances the death penalty was mandatory.
 {¶ 17} "Assignment of Error Number Eighteen: The conduct of the defendant's trial lawyers fell below the constitutionally required level when they proposed jury instructions placing the burden of proving the mitigating factors by a preponderance of the evidence on the defendant.
 {¶ 18} "Assignment of Error Number Nineteen: The conduct of the defendant's trial lawyers fell below the constitutionally required level when they failed to protect the defendant's rights under international law.
 {¶ 19} "Assignment of Error Number Twenty: The trial court erred in dismissing Juror No. 02761, Julie Vitale.
 {¶ 20} "Assignment of Error Number Twenty-one: The trial court erred in overruling defendant's motion to suppress the statements [sic].
 {¶ 21} "Assignment of Error Number Twenty-two: The trial court erred in failing to dismiss the death penalty pursuant to the defendant's motion. Weighing the aggravating circumstances against the mitigating factors.
 {¶ 22} In his first and second assignments of error, appellant argues that the jury and the court erred in finding that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt and that death was the appropriate sentence.
 {¶ 23} R.C. 2929.03(D)(2) provides that the jury "shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender."
 {¶ 24} After receiving the jury's recommendation that the sentence of death be imposed, the court must find "* * * by proof beyond a reasonable doubt, * * *, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, * * *" before it can impose the death penalty. R.C. 2929.03(D)(3).
 {¶ 25} The appellate court also has a statutory duty to independently review a death sentence. R.C. 2929.05(A). Therefore, we are statutorily required to determine whether the evidence supports the jury's finding of each aggravating circumstance, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentence is appropriate. In determining whether the sentence is appropriate, the court must determine if the sentence is excessive or disproportionate to those affirmed in similar cases.
In this case, appellant was indicted for aggravated murder with a death penalty specification pursuant to R.C. 2929.04(A)(7). That section provides that the prosecution must prove beyond a reasonable doubt that the aggravated murder "offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit * * * aggravated robbery * * *, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design."
 {¶ 26} Appellant does not challenge on appeal that there was insufficient evidence to establish the aggravating circumstances beyond a reasonable doubt. However, appellant argues that the jury and trial court did not properly weigh the aggravating circumstances against the mitigating evidence in this case. Appellant contends that the trial court's findings were flawed in three respects. Appellee contends, however, that we need not address these alleged errors since the appellate court independently weighs the aggravating circumstances against the mitigating factors.
 {¶ 27} We agree with appellee that our independent review of the death sentence will correct any alleged errors. State v. LaMar (2002),95 Ohio St.3d 181, 210, 2002-Ohio-2128, certiorari denied (2002),531 U.S. 1055; State v. Hill (1996), 75 Ohio St.3d 195, 210, certiorari denied (1996), 519 U.S. 895; State v. Wilson (1996), 74 Ohio St.3d 381,397, certiorari denied (1996), 519 U.S. 845; and State v. Fox (1994),69 Ohio St.3d 183, However, for purposes of preventing future errors in death penalty cases, we will address the issues appellant has raised.
 {¶ 28} First, appellant contends that while the court placed the discussion of the nature and circumstances of the offense under the heading of "Mitigating Factors," it in fact weighed them on the side of aggravation. Appellant cites to two portions of the court's findings within the section entitled "Mitigating Factors" where the court made statements indicating that it weighed the mitigating evidence against the specific circumstances of the crime.
 {¶ 29} After reciting the mitigating evidence relating to appellant's history, character, and background, the court stated: "Therefore, the Court finds nothing in defendant's character, background and history to mitigate the brutal and senseless killing of a defenseless seventy-six year old man."
 {¶ 30} The court continues by considering other miscellaneous mitigating factors, but concludes that these factors: "* * * pale before the simple fact that Defendant's actions were plotted, vicious, persistent, and utterly callous." However, the court properly noted that the aggravating circumstance of which the jury found appellant guilty was solely that he caused the death of Mr. Kozlowski while committing aggravated robbery and that appellant was the principal offender in the aggravated murder.
 {¶ 31} We agree with appellant that the court's comments about the nature and circumstances of the offense indicate that the court erroneously weighed the nature and circumstances of the crime against the mitigation evidence.
The Ohio Supreme Court has held that "[u]nder R.C. 2929.03(F), a trial court or three-judge panel may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." State v. Stumpf (1987), 32 Ohio St.3d 95, paragraph one of the syllabus, certiorari denied (1988), 484 U.S. 1079. Again in State v.LaMar, supra at 208-209, the Ohio Supreme Court reiterated that the court may "rely upon and cite the nature and circumstances of the offense as reasons to support its finding that the aggravating circumstances of which the jury found the defendant guilty outweigh the mitigating factors beyond a reasonable doubt." However, the court may not weigh the nature and circumstances of the case as aggravating circumstances against the mitigating factors. State v. Wogenstahl (1996), 75 Ohio St.3d 344, paragraph one and two of the syllabus; State v. Johnson (1986),24 Ohio St.3d 87, syllabus, certiorari denied (1990), 494 U.S. 1039, overruled on other grounds in State v. Jenks (1991), 61 Ohio St.3d 259;State v. Nields (2001), 93 Ohio St.3d 6, 40; State v. Harwell,149 Ohio App.3d 147, 2002-Ohio-4349 at ¶ 27, appeal granted (2003),98 Ohio St.3d 1421, 2003-Ohio-259. While these cases appear to conflict, we find that the distinction is whether the court recognizes the difference between weighing the nature and circumstances of the offense as aggravating circumstances against the mitigating factors versus the use of the nature and circumstances of the offense to state a conclusion that the statutory aggravating circumstances outweighed the mitigating factors. State v. LaMar, supra at 209, and State v. Davis (1988),38 Ohio St.3d 361, 367-373, certiorari denied (1989), 488 U.S. 1034.
In this case the court clearly weighed the mitigating factors against the nature and circumstances of the crime in order to conclude that the mitigating factors "pale before" the facts of the crime. As we have already stated, however, the trial court's error is harmless because our independent review of appellant's death sentence will correct this error.
 {¶ 32} Second, appellant contends that the court evaluated the mitigation evidence in terms of blame. Appellant cites to a portion of the trial court's findings where the court stated that: "Even though Mr. Tenace was himself a victim of violence throughout his childhood, that is no excuse to inflict it upon someone else who is totally innocent."
 {¶ 33} Appellee contends that the trial court used the term "excuse" as a shorthand manner for noting that the mitigating factors did not mitigate against imposition of the death penalty.
 {¶ 34} The R.C. 2929.04(B) mitigating factors "are not necessarily related to a defendant's culpability but, rather, * * * to the issue of whether an offender * * * should be sentenced to death." State v.Holloway (1988), 38 Ohio St.3d 239, paragraph one of the syllabus, certiorari denied (1989), 492 U.S. 925. Therefore, in State v. Getsey
(1998), 84 Ohio St.3d 180, 201, certiorari denied (1999), 527 U.S. 1042, the Ohio Supreme Court held that jury instructions using terms like "`lessening, weakening, excusing,' which are typically associated with blame or culpability for the crime" are not proper. The purpose of reviewing mitigating factors is solely to determine whether death is an appropriate penalty.
However, in this case, the court used these terms in context of its R.C. 2929.03(F) opinion. In that context, we agree with appellee that the court used the term "excuse" to conclude that appellant's background did not mitigate against the imposition of the death penalty. While the court's word choice may have been incorrect, its intent was clear.
 {¶ 35} Third, appellant contends that the court made up facts about appellant's history, character, and background. Appellant quotes from the trial court's findings that: "[w]hile Mr. Tenace's experiences are unfortunate, they are not uncommon" and that "there are many other people who have endured similar experiences without resorting to lawlessness." Appellant argues that in fact, those who did live a similar lifestyle to appellant (his siblings and father), did resort to lawlessness. Appellant notes that the Supreme Court of Ohio also used similar language in State v. Dickerson (1989), 45 Ohio St.3d 206, certiorari denied (1990), 494 U.S. 1090. However, he contends that the mitigating factors in this case are far greater than those in theDickerson case.
 {¶ 36} We find that the trial court's statements in this case, as well as the Ohio Supreme Court's statements in the Dickerson case, were not actually intended as statements of fact. Rather, they were intended as a commentary that there are other people who suffered terrible experiences in their childhood who did not commit murder as adults. Even the facts of this case support this view because the two other people who were raised within the same environment as appellant have not committed murder as adults. Therefore, we find that the trial court did not err by making this statement.
The remaining portion of appellant's first and second assignments of error relate to this court's independent review of the death penalty. These issues will be addressed after we address all of appellant's assignments of errors.
 {¶ 37} Therefore, in part, appellant's first and second assignments of error are found not well-taken.
II. Motion for Acquittal — Sufficiency of the Evidence and Manifest Weight of the Evidence.
 {¶ 38} In his third assignment of error, appellant argues that the trial court erred in failing to grant his Crim.R. 29(A) motion for acquittal. He presents two issues for our consideration under this assignment of error. In order to address these issues, we must review the evidence that was presented in this case.
 {¶ 39} Mr. Kozlowski's neighbor called his brother on Friday, January 29, 1994, because she had not seen Mr. Kozlowski since Tuesday of that week and she saw a light on in his home early in the morning.
 {¶ 40} The deposition of Mr. Kozlowski's brother, Chester Kozlowski, was read into evidence because he died in 1997. Chester Kozlowski recalled that the day he went to check on his brother the weather was mild, but cold, and dry. He found the storm door unlocked and he used his key to open the front door. He immediately saw his 76 year old brother laying across the threshold of the living room and dining room in a pool of blood with something wrapped around his neck like a scarf. The phone was laying beside his brother with the cord pulled out of the wall. He tried to roll his brother over, but he could not do it. His brother appeared to be dead. Chester Kozlowski checked the rest of the house to see if anyone was there but found no one. After the medics arrived, he waited outside. He didn't think his brother kept a lot of money around, but he knew that his brother paid his bills in cash.
 {¶ 41} The responding police officer testified that he found Mr. Kozlowski lying on his back, with a material wrapped around his mouth and face. The officer observed that Mr. Kozlowski's face looked like it has been severely beaten. There was blood on the floor a few inches to a foot from the head. The officer could not recall the weather conditions that day.
 {¶ 42} Lori Moore testified that she lived with her daughters LaRosa Moore and Melissa Moore, their children, their boyfriends Ben (a/k/a Lamont) Covington and Ernest Moore, and Marlene Murphy. She testified that appellant came to stay with them on Dec. 24, 1993. She first met him in 1991 when he was working with her daughter's boyfriends doing construction work and handyman jobs. She allowed appellant to stay at her house because he had no where to stay and all the shelters were full.
 {¶ 43} She recalled that he would find work by going to the library and getting voter registration lists or household owner lists and then make solicitation calls for work. He inadvertently gave her one of his lists when he wrote on the back of the paper a Western Union code that she needed to pick up money for him at Western Union two days after Mr. Kozlowski was killed. She gave the paper to the detectives. Appellant had told her at that time that he needed the money in order to leave town. On the front of the paper was Mr. Kozlowski's name, address, and phone number circled in green ink. Mr. Kozlowski's neighbor also recalled that appellant had recently performed repair work for Mr. Kozlowski.
 {¶ 44} Lori Moore also testified that she owned a vehicle at that time which she allowed certain people to drive. She allowed Murphy to drive appellant to Mr. Kozlowski's home about a week prior to his death. Murphy had also taken appellant to get materials for the work. Appellant told Moore that Kozlowski was a nice old man and that he had a pocket full of money. She also knew that appellant got paid in cash because she saw him return with cash after completing his work.
 {¶ 45} Moore testified that Covington drove appellant over to Mr. Kozlowski's house once around January 25. Appellant called Mr. Kozlowski before leaving to tell Mr. Kozlowski that he had overpaid appellant and that he was coming over to return some of the money. Moore's testimony was inconsistent as to whether appellant was high at the time he left for Mr. Kozlowski's house. They were gone about an hour and a half. Later than night, she heard Covington throwing up in the bathroom. When he told her what was wrong, she started to look up how to call the police to get appellant out of her house because she was afraid for her family. She later saw appellant walking around the house agitated and saying that "he must have choked on a gag." Appellant had gotten high while they were out and was still high on drugs at that time. Covington, however, testified that he did not throw up that night and denied speaking to Lori Moore in the middle of the night.
 {¶ 46} Moore heard appellant making phone calls to New York saying he had to get out of town. She found this to be unusual because he never made any phone calls when he arrived. Appellant also told her that: "I think I killed him" and "He must have choked on the gag."
 {¶ 47} The next day or the day after that, Moore and her family started watching the news. When they were watching the news together, the story about Mr. Kozlowski came on. Appellant was present and said "I don't want to hear this s---" and walked out of the room. Appellant then started asking if Moore knew and whether her son's friends would tell on him. She left the house to call CrimeStopper, the Toledo Police Dept., the local FBI, the FBI office in Cleveland, and the Mayor of Toledo. Everyone told her that there was no detective available on the weekend.
 {¶ 48} Detectives finally called her back Monday morning. She showed them the paper with the address circled. She recalled telling Detective Ross that she had overheard appellant say to someone else in the house: "He think I killed that m--- f----". However, the officer testified that he did not have this statement in his notes. Moore then took them into the house and they arrested appellant.
Moore also recalled that appellant was addicted to crack cocaine and often used it. She could easily tell when he was using the drug because it would cause him to be shaky and not speak well. Since he had come to live with them, appellant was often high on drugs.
 {¶ 49} Covington testified that he has a criminal record for attempted burglary and escape and is currently on parole. Covington met appellant through a friend in 1991 and then became reacquainted with him in December 1993 when he returned to Toledo. Appellant asked Covington for a ride to Mr. Kozlowski's house one night. He had driven appellant to other jobs before but never to this house. Appellant told Covington that he had been overpaid and was returning the money. They left about 5:30 p.m. Covington had to ask Moore for permission to drive her car. They were gone about an hour or an hour and a half. Covington testified that appellant did not seem high on drugs that night.
 {¶ 50} Covington recalled that it was snowing hard that night and the streets were bad. Covington dropped appellant off and then drove to Bobby Howard's, a store about a block or block and a half away. Covington estimated that it took him two and one-half minutes to get to the store because of the weather. He was in the store for approximately four or five minutes and was waiting to place his order when he saw appellant get into the car and beckon him to come out. Appellant said that he had taken care of business, so they drove off. Covington recalled appellant rolling the window down and Covington rolled it back up because it was snowing. Appellant said he was hot and then asked Covington to stop because appellant had to throw up. Covington stopped the car and appellant got out for a few minutes. Then they drove home. Appellant paid Covington $20 for the ride when they returned home.
A day or two later, appellant asked to borrow some money from Covington. Covington told appellant that Covington's girlfriend couldn't loan appellant anything. Appellant then said he had to have the money because he "just killed a m---- f----." He also stated that: "I just stomped his head a couple of times and he wasn't moving, but I don't know if he's dead." Covington had an idea who appellant was talking about but did not know for sure at that time. Covington later asked appellant and found out that it happened where Covington had driven appellant. Covington became scared and upset and told Lori, Melissa, and LaRosa Moore. They then starting watching the news. When Covington saw the house on the broadcast, he knew that it was where he had driven appellant. When appellant heard this newscast, he dropped his head, ran his fingers through his hair and said he was sorry and that he did not want to "hear no more of that s---."
 {¶ 51} The family decided to turn appellant in, but did not tell appellant because they were afraid of him. Appellant had told Covington earlier that if he did not say anything, he didn't have anything to worry about.
 {¶ 52} Marlene Murphy testified that she had lived with the Moores for five or six years. She drove appellant to the library once to look up older houses that might need work. She also had driven him to the Handy Andy store to get cement. She recalled driving appellant to Mr. Kozlowski's home shortly before he was killed. She took him once and waited while appellant went in for a few minutes and then took him home.
She also testified that appellant was "fiening" the night Covington took him to see Mr. Kozlowski. He wasn't high but all he was thinking about was getting crack cocaine. She could not recall how long they had been gone that night. After Covington and appellant returned, she noticed that appellant was jittery and jumpy; he was not acting normal. Appellant made her nervous. Sometime later, she overheard Covington and appellant talking and Covington getting upset. She overheard appellant say: "He might have choked on the gag." and "I think I killed him." She could not recall exactly when the statements were made because it was so long ago, but was certain that they were said.
 {¶ 53} The family waited to check the papers and watch the news to see if what he said was true. Later, after they read it in the paper, Murphy heard him say: "There's not enough evidence. They can't pin this on anybody. Huh." Then he started acting normal again.
 {¶ 54} Cynthia Beisser, M.D., the deputy coroner and forensic pathologist of Lucas County, Ohio, testified that she performed an autopsy of Mr. Kozlowski. He was 76 years old and weighed 142 pounds. He had a shirt wrapped around his face, with a knot in his mouth in a gag form. Because his body had already started to decompose, she had to be careful to account for the changes due to decomposition. She estimated that he had been dead 12-24 hours, although the time of death was difficult to determine.
 {¶ 55} She testified that there was "quite a bit of trauma " (bruises, abrasions, and lacerations) to his face and neck and some minor trauma to the left leg. A blunt force injury to the face had caused bruising along the forehead and right side of the face, a contusion about six-by-four inches along the right side of his forehead and right cheek. On the left side he had a five-by-three inch contusion over his left eye and cheek. The bridge of the nose was fractured. He had two minor abrasions on his left leg near his knee. All these injuries were inflicted at the same time. She did not believe that these injuries could have been caused by a fall because of the large area of the face that was injured.
 {¶ 56} Mr. Kozlowski also had two fractures in his skull. One was a hairline fracture through the sphenoid bone. The other was a minor depressed fracture over the roof of the sphenoid sinus. While it would not have taken much force to make the second fracture, the fracture was consistent with a blunt force trauma to the head. Furthermore, the location of blood in the back of his head and over his brain would also be consistent with blunt force trauma. He had fractures in the fourth, fifth and sixth ribs, located at the center of the chest on the right side. A blunt force would also cause this type of injury. She also concluded that these injuries were caused right around the time of death. There was no evidence that Mr. Kozlowski was strangled with a telephone cord. There was also nothing obstructing his airway. She also testified that to a reasonable degree of medical or scientific certainty based on her experience and training, the gag did not cause Mr. Kozlowski to suffocate. His nose was not covered and the gag was not far enough in his mouth to suffocate him.
 {¶ 57} She also testified that there was blood in the neck area. While this blood did support a theory of blunt force trauma, it did not indicate that Mr. Kozlowski had been stomped upon since there were no appearance of tread marks on his face. Damage to the bones and cartilage in his neck was consistent with blunt force trauma. The injuries indicated that there was pressure from both sides of the neck toward the front, a squeezing type of pressure. She testified that strangulation occurs from cutting off the blood supply and therefore oxygen to the brain for five or six minutes. The injuries she observed were consistent with strangulation by hand. She could not be certain that the strangulation was by hand. It could have been from some blunt force but it also needed squeezing to occur. She also could not be certain whether Mr. Kozlowski was strangled long enough to cause his death or the neck injuries were caused by a momentary grasping of the neck.
 {¶ 58} She concluded that the cause of death was both "blunt craniocerebral trauma and strangulation." Mr. Kozlowski could possibly have died solely from either the blunt injuries to the head or the strangulation. She could not determine which injuries were suffered first. However, she estimated that Mr. Kozlowski probably died within fifteen minutes after infliction of his injuries. She also testified that even after Mr. Kozlowski died, his body could make noise.
 {¶ 59} The investigating police officer testified that when he arrived on the scene after the other officers, he observed Mr. Kozlowski's dentures under a chair and that Mr. Kozlowski's slippers appeared as though he had stepped out of them because there was a rug over one of the slippers. Blood appeared to be coming from Mr. Kozlowski's mouth. A struggle appeared to have started in front of the easy chair and moved over to the area where Mr. Kozlowski was found. The television was still on as well as a lamp next to the chair. The officer found the phone on the stand, but the cord was pulled out of the wall. In the open buffet drawer, there was an empty cigar box. There were no other signs of ransacking. There was no evidence of forced entry.
 {¶ 60} The officer testified that he was off duty the weekend Moore was trying to reach him, but was on call. However, he did not receive any calls. On Monday, he received Moore's message and a phone call from the desk clerk at the FBI in Cleveland. The officer met with Moore and then took eight officers to her house to arrest appellant. Appellant did not resist arrest. The officer testified that appellant is five feet, eight inches tall and weighs about 160 pounds.
 {¶ 61} The officer questioned appellant after his arrest. After appellant confessed, the officer taped the conversation. Appellant stated he was not under influence of drugs at the time, signed a Miranda form, and seemed articulate. Appellant stated that he found Mr. Kozlowski's name and phone number through the street guide. The officer had him identify the paper Moore had given the officer. Appellant had circled Mr. Kozlowski's name because he wanted some work done. Appellant did the work one-to-two weeks prior to Mr. Kozlowski's death.
 {¶ 62} When asked what happened at Mr. Kozlowski's home, appellant became very upset. He was full of despair and was crying. He stated that somebody should shoot him, that he wanted to die, and that he was sorry. Appellant could not give a date that he went to see Mr. Kozlowski. All he could remember was that it was cold and snowing that night. He said that he had been up drinking beer and doing crack cocaine for several days. Appellant knocked on the front door and Mr. Kozlowski motioned for appellant to go to the side door. Mr. Kozlowski let appellant inside. Appellant stated that he was trying to get more work from Mr. Kozlowski and he argued with appellant about being overcharged. Appellant said he grabbed the money from Mr. Kozlowski and began to wrestle with Mr. Kozlowski. The two fell to the floor and while Mr. Kozlowski lay on the floor moaning, appellant put a gag on Mr. Kozlowski so that he would not be heard by the neighbors. Appellant denied hitting or kicking Mr. Kozlowski. Appellant remembered that as he was leaving with Mr. Kozlowski's money, he was still moaning. Appellant pulled out the phone cord because he did not want Mr. Kozlowski calling for help and appellant needed some time to get away.
 {¶ 63} We now turn to the issues raised in appellant's third assignment of error. First, appellant contends that the prosecution failed to prove the element of intent to kill. Appellant argues that there was no evidence to prove that the amount of injury Mr. Kozlowski suffered indicated that appellant intended to kill Mr. Kozlowski or that he was repeatedly and viciously beaten.
 {¶ 64} In order to establish that appellant committed aggravated murder, the prosecution was required to prove beyond a reasonable doubt in this case that appellant purposely caused the death of Mr. Kozlowski while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, aggravated robbery. R.C.2903.01(B).
 {¶ 65} A trial court may not grant a Crim.R. 29(A) motion for acquittal where the evidence adduced at trial shows that "reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt." State v.Bridgeman (1978), 55 Ohio St.2d 261, syllabus. When an appellate court reviews a ruling on a Crim.R. 29(A) motion, it employs the same standard used to determine whether the evidence was sufficient to sustain a conviction. State v. Carter (1995), 72, Ohio St.3d 545, 553. Under the sufficiency standard, we must determine whether the evidence admitted at trial, "* * * if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 66} Appellant contends that there was no evidence presented in this case that Mr. Kozlowski was repeatedly and viciously beaten and, therefore, that there was no evidence that appellant intended to cause his death. Instead, appellant argues, the evidence substantiates his claim that he briefly struggled with Mr. Kozlowski.
 {¶ 67} We do not accept appellant's argument that the fact that little force was needed to kill Mr. Kozlowski can only be interpreted as evidence that appellant did not intend to kill Mr. Kozlowski. While the deputy coroner testified that it would not have taken much force to cause the fractures to Mr. Kozlowski's head, all of his injuries were consistent with the theory that they were caused by a blunt force trauma. She concluded that Mr. Kozlowski was killed by some type of blunt force trauma that had caused a 6-inch contusion along the right side of his face, a 4-inch contusion on the left side of his face, fractured the bridge of his nose, fractured his skull, caused subgaleal and subarachnoid bleeding, fractured three ribs on the center right side of his chest, and/or strangulation. Even if the injuries that Mr. Kozlowski suffered could have been caused by a brief struggle or slight force, that fact alone does not conclusively mean that appellant did not intend to kill his victim. It could also mean that appellant's victim was easy to kill.
 {¶ 68} Furthermore, there was other evidence in this case to establish that appellant specifically intended to kill Mr. Kozlowski. A reasonable jury could have inferred from the evidence that appellant went to Mr. Kozlowski's home intending to rob him knowing that Mr. Kozlowski was an old man and that he knew who appellant was. Appellant hit Mr. Kozlowski in the face and chest and attempted to or did strangle him to death. Appellant gaged Mr. Kozlowski and pulled the telephone cord out of the wall thereby preventing Mr. Kozlowski from calling for help. Appellant was also physically ill after leaving the scene.
 {¶ 69} Upon a review of all of the evidence, we find that there was sufficient evidence presented from which a rational jury could find beyond a reasonable doubt that appellant purposely caused the death of Mr. Kozlowski while committing aggravated robbery.
Appellant questions whether the jury was confused on this issue because it questioned the court about the issue of specific intent. First, the jury asked the court: "Can someone explain to us when the gist of the offense is a prohibition against conduct of a certain nature? How about an example?" The court directed the jury to read the court's written jury instructions.
 {¶ 70} The second inquiry was: "Do we need to agree (or find) that the defendant had purpose, result, conduct, additional, how determined, motive, specific intent, causation, or can a preponderance of the above lead us to a conclusion?" The foreperson explained to the court that the jury was confused about the comments in the written jury instructions under the aggravated murder section. The foreperson stated that:
 {¶ 71} "* * * Each section had a — a title. And one of the titles there — well, the titles were such as purpose, result, conduct, additional, how to determine, motivated, and then two more, specific intent and causation. And we were having a discussion about what purpose meant, and that's why we sent out the first question. And you informed us that the instructions were the instructions and you couldn't expand upon that. So then we started talking some more about it and we were wondering — we were wondering if we all agreed that the result, for instance, as described here, happened and the conduct happened and — and as many number of those that you want, but there was one of those that we did not agree on or we could not determine as to whether there was facts that supported that statement or explanation of whatever it was there, did we have to — do we have to not only consider but prove or feel that we were sure of what happened or that these requirements were met? And I'm kind of rambling because I don't know how else to say this. But — or could we just say, like, so many of them were met, the others must be there too?"
 {¶ 72} The court responded by stating that:
 {¶ 73} "Okay. I see what you're saying. First paragraph under aggravated murder lists the elements that the State must prove beyond a reasonable doubt. The subsections underneath it are definitions to the words in the first paragraph. So that purpose is defined and that's defined in the first one, two, three, four, five paragraphs under result, conduct, additional and how to determine. And the first paragraph labeled purpose, that whole series of paragraphs is the definition of purpose as defined under the law, because under this section you must find beyond a reasonable doubt that the defendant did purposely cause the death. So those paragraphs define for you purposely, what that means. So those are not the elements of the offense, all of them. Those define the element purpose."
 {¶ 74} Appellant objected to the court's process of answering the jury's questions orally rather than in writing. After the court and parties discussed appellant's objection, the foreperson then asked if the jury could present another question. The court instructed the foreperson to write the question down. The jury then presented this question to the court: "Will you describe the difference between purpose and premeditation."
After discussing the jury's questions, the court then stated to the parties that: "My concern here, and I'll say on the record, gentlemen, that this jury seems confused. Seems to be becoming more and more of a crap shoot in this case what verdict it would be. I would urge both sides again to explore the possibility of settlement of this case short of a jury verdict, if that is at all possible." Thereupon the defense reiterated its willingness to enter a plea in this case.
 {¶ 75} When trial reconvened the following day, the court overruled appellant's objection that discussions with the jury should be done only by writing. Then, with defense counsel's approval, the court directed the jury to reread the instructions and "* * * consider each one of the instructions in light of all the other instructions. They are all interwoven together, and I cannot separate one from the other without going into the interplay of how they affect each other. If you reread the instructions, I'm confident that your question will become clearer to you. And it might help if you read them aloud in the jury room. But, specifically, to answer your question, I can't answer it any better than that. One question you had was, `Will you describe the difference between purpose and premeditation.' Now premeditation, that word has never been used in this case. Please do not use that word or apply what you think the definition of that word is to this case. You must only use the words and definitions that are given in the jury instructions and not bring in any outside conceptions of what you think the law may be or what the legal terms may be. Okay? I know that is not maybe what you wanted to hear, but that's the answer that I have to give to you. So I would ask if you would return to the jury room, continue your deliberations. * * *."
 {¶ 76} The jury then deliberated further and reached a unanimous guilty verdict. Upon a review of the written jury instruction and the above portions of the transcript, we find that the jury was sufficiently guided by the court to understand their duty. Because the jury did not further question the court about its duty after the court directed them to reread the jury instructions and consider them as a whole, and absent direct evidence that the jury was unable to understand the jury instructions after having done so, we must presume that it did follow the jury instructions. Pang v. Minch (1990), 53 Ohio St.3d 186, paragraph four of the syllabus.
 {¶ 77} In the second issue appellant raises under his third assignment of error, he contends that the conviction was contrary to manifest weight of the evidence because there was no evidence that he intended to kill Mr. Kozlowski.
 {¶ 78} A challenge to the weight of the evidence questions whether the greater amount of credible evidence was admitted to support the conviction than not. State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus, and State v. Smith (1997), 80 Ohio St.3d 89,113-114, certiorari denied (1998), 523 U.S. 1125. A reviewing court must grant a new trial only in an exceptional case where the evidence weighs heavily against conviction. Thompkins, supra at 387.
 {¶ 79} Upon a review of all of the evidence, we find that, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, the jury did not lose its way, a manifest miscarriage of justice did not occur, and that appellant's convictions are not contrary to the manifest weight of the evidence. A rational jury could reasonably find that appellant specifically intended to kill Mr. Kozlowski in order to accomplish the robbery.
 {¶ 80} Appellant's third assignment of error is not well-taken.
 {¶ 81} Prosecutorial Misconduct
 {¶ 82} Appellant contends in his fourth, fifth, sixth, seventh, eighth, ninth, and tenth assignment of errors that the prosecution committed misconduct by allegedly making outlandish remarks, misstating the evidence, and by confusing legal concepts.
 {¶ 83} If appellant failed to object to the prosecutor's actions or comments, they are analyzed under the plain error rule. State v.LaMar, supra at 211, and State v. Greer (1988), 39 Ohio St.3d 236, 244, certiorari denied (1989), 490 U.S. 1028 (the waiver doctrine applies in capital cases). Plain error is found only in exceptional cases in order to prevent a manifest miscarriage of justice. State v. Long (1978),53 Ohio St.2d 91, 95. Plain error will be recognized where, but for the error, the outcome of the trial would have been different. Crim.R. 52(B) and State v. Wogenstahl (1996), 75 Ohio St.3d 344, 357.
 {¶ 84} However, if appellant objected to the prosecutor's actions or comments, they are analyzed to determine whether the action or comment was improper and, if so, whether it prejudicially affected substantial rights of the appellant. State v. Thomas, 97 Ohio St.3d 309,2002-Ohio-6624, at ¶ 59; State v. Jones (2000), 90 Ohio St.3d 403,420; and State v. Smith (1984), 14 Ohio St.3d 13, 14. A trial will not be deemed "unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. State v. LaMar, supra at 210, and State v. Fears (1999), 86 Ohio St.3d 329, 336, certiorari denied (2000), 529 U.S. 1039. We must consider, for example, whether this was an "isolated incident in an otherwise properly tried case," whether the errors were trivial, whether the trial court took corrective action, and whether the other evidence of guilt was overwhelming. State v. Keenan (1993), 66 Ohio St.3d 402, 410.
 {¶ 85} Appellant correctly points out that while a prosecutor must zealously advocate his position, he must do so within the "* * * boundaries of acceptable argument and must refrain from the desire to make outlandish remarks, misstate evidence, or confuse legal concepts."State v. Fears, supra at 332. However, our focus is on the issue of whether the trial was fair, not the culpability of the prosecutor. Cf.Smith v. Phillips (1982), 455 U.S. 209, 219. We also must evaluate the prosecutor's statements carefully so as not to view these isolated comments out of context and in the worst light. State v. Myers,97 Ohio St.3d 335, 2002-Ohio-6658, at ¶ 142, certiorari denied (2003), ___ U.S.L.W. ___, 2003 U.S. LEXIS 4337.
 {¶ 86} In his fourth and eighth assignments of error, appellant contends that the prosecutor misstated the evidence during his opening and closing arguments. Appellee contends that these two alleged errors are significant because they relate to the issue of appellant's intent to kill, a critical issue in this trial.
In his opening arguments, the prosecution stated that: "* * * You'll hear about massive damage that was done to him [Mr. Kozlowski], the savage beating that he took; that the only reason that this amount ofdamage was inflicted on this person was to cause his death. * * *" (emphasis added)
 {¶ 87} Appellee contends that the prosecutor was not stating that the coroner would testify about appellant's intent; but, rather that from the coroner's testimony the jury could infer that appellant intended to kill Mr. Kozlowski. Alternatively, appellee argues that if the prosecutor's statements were improper, the error only benefitted appellant because the prosecutor was promising more than what he had called the coroner to testify about.
 {¶ 88} Opening statements are not evidence, but only a statement of what the prosecution intends to prove by the evidence to be presented. State v. Wilson (Apr. 19, 2002), 1st Dist. App. No. C-000670, at 13, 2002-Ohio-1854. The general purpose of opening statements is to give the jury an outline of the "general nature of the case" and "the facts which counsel expect the evidence to show" and not a "verbatim recitation of what evidence will in fact be presented to the jury." Statev. Hamilton (Feb. 11, 2002), 12th Dist. App. No. CA2001-04-044, at 12,2002-Ohio-560 and State v. Butler (Aug. 11, 2000), 6th Dist. App. No. L-99-1177, L-99-1178, at 9, both citing Maggio v. Cleveland (1949),151 Ohio St. 136, paragraph one of the syllabus. Inconsistencies in the opening statements regarding the evidence expected to be shown and that which was actually presented must be evaluated to determine if they affected the outcome of the trial. State v. Hamilton, supra at 13.
 {¶ 89} We agree with appellant that the coroner never testified that the amount of injury suffered was obviously inflicted for the purpose of causing death. We further agree that the prosecutor implied as much in his opening statement.
 {¶ 90} Furthermore, during his closing arguments, the prosecutor stated that:
 {¶ 91} "* * * There's no way to tell exactly how those injuries were inflicted except that they were by blunt-force injury. Now, Mr. Wingate got up here and said stomping, stomping, stomping. That's not the State's theory. We don't know how it actually occurred. We just know that blunt-force injury occurred and that this person inflicted the injury.
 {¶ 92} "Now, this was massive damage. It was on both sides of the face, causing bleeding under the skull and then also on top of the skull between the scalp and the skull. There was massive injury to his face. You also then have the injury to the ribs, and then you have the injuries to the neck. * * *" (emphasis added)
 {¶ 93} The prosecution has always been afforded a certain degree of latitude in closing arguments. State v. Myers, supra at ¶ 145. Therefore, the prosecution may make fair comments on the evidence and reasonable inferences that the jury could draw from the evidence. Statev. Tibbetts (2001), 92 Ohio St.3d 146, 169, certiorari denied (2002),534 U.S. 1144.
The coroner testified that Mr. Kozlowski suffered quite a bit of trauma to his face and neck. She stated that the fracture injuries could have been inflicted with minimal blunt force. She also testified that Mr. Kozlowski was injured by strangulation. She could not, however, determine which one of these actions or whether both caused his death.
 {¶ 94} The prosecution's use of the term "massive" can be viewed in either a quantitative or qualitative sense. Mr. Kozlowski did suffer numerous injuries from the beating and strangulation. The fact that it might not have taken much force to cause Mr. Kozlowski's death does not somehow minimize the consequences of the various injuries. Even if the term "massive" was an exaggeration of the evidence, it fell within the boundaries allowed the prosecution in closing argument.
 {¶ 95} Nonetheless, we will consider the affect of these two statements on the outcome of this case. Since appellant failed to object to either of the prosecutor's statements at the time they were made so that the court could take corrective action, we must view the errors under the plain error standard.
 {¶ 96} Under this standard, we conclude that the outcome of the trial would not have been any different even if these two statements had not occurred. We agree with appellee that if the jury would have noticed anything, it would have been that the coroner did not testify as the prosecution had indicated. We have already outlined under the third assignment of error the other evidence we believe supported the jury's verdict that appellant intended to kill Mr. Kozlowski. The amount of damage appellant inflicted upon Mr. Kozlowski would not have been the only evidence needed to prove appellant's intent. Therefore, appellant's fourth and eighth assignments of error are not well-taken.
 {¶ 97} In his fifth assignment of error, appellant contends that during his closing arguments, the prosecutor told the jury that appellant had left the victim to die when he made the following statement knowing that there was no evidence to support the statement:
 {¶ 98} "* * * Well, if he didn't try to kill the victim and if he choked on a gag, why is it that when he got back in the car with Ben Covington, he puked, he threw up, he got sick? The actions were so reprehensible that even he couldn't take it. He knew what he had done the moment he got — he left that house and got into Covington's car.
 {¶ 99} "He choked on a gag. He did not choke on a gag. He left the man to die, if he didn't already kill him, in that bloody state. And you're going to see these photos, folks. And I don't mean to incite you, but that's the evidence and that's been admitted. You folks will have an opportunity to review that."
 {¶ 100} We find that the quoted statement was a fair comment on a reasonable inference that could be drawn from the evidence. Appellant's fifth assignment of error is not well-taken.
 {¶ 101} In his sixth assignment of error, appellant contends that the prosecutor also improperly stated in his closing arguments that appellant had stomped the victim when there was no evidence to support that conclusion. Appellee argues that it was improper for the prosecution to refer to this testimony when it knew that its own witness, the coroner, testified that Mr. Kozlowski had not been stomped upon. Furthermore, he argues that Covington's testimony was not credible because he had a great motivation to fabricate his testimony. The prosecutor stated that:
 {¶ 102} "* * * The key to the investigation, the key to the case was when Covington was approached by the defendant and he said, I need some money. Covington said, I have to get some cigarettes and blah, blah, blah. First of all, he went and talked to his girlfriend, his fiancé. He indicated, I'll talk to her. When he came back, when he was rejected, when the defendant was rejected, what did he say? The defendant blew up and said, I just killed the M.F. I stomped him. Lamont said, That man on Wanba Street? He said yeah."
 {¶ 103} We find that there was no prosecutorial misconduct with regard to this statement. The prosecution did not state that Mr. Kozlowski was stomped, he merely repeated the testimony of Covington. The prosecutor reiterated Covington's testimony in order to emphasize appellant's confession, not how he killed Mr. Kozlowski. Furthermore, while the deputy coroner testified that there was no evidence of stomping, that does not conclusively prove that there was no stomping. Her testimony does not conflict with Covington's testimony. The prosecutor acknowledged in closing arguments that he did not believe that appellant stomped on Mr. Kozlowski, when the prosecutor stated that:
 {¶ 104} "* * * Now, Mr. Wingate got up here and said stomping, stomping, stomping. That's not the State's theory. We don't know how it actually occurred. We just know that blunt-force injury occurred and that his person inflicted the injury. * * *"
 {¶ 105} Taking the prosecution's closing arguments as a whole, we find that the statements were based upon the evidence and did not mislead the jury. Therefore, appellant's sixth assignment of error is not well-taken.
 {¶ 106} In his seventh assignment of error, appellant contends that the prosecutor improperly asserted that appellant had a plan to kill Mr. Kozlowski because there was no evidence to support that conclusion. At trial, the prosecutor stated:
 {¶ 107} "You know, Mr. Tenace had a plan. There you go. His plan was to go in the house — there's his TV stand. The plan was to go in the house and pretend that this poor gentleman — that he owed this poor gentleman some money, find out where the money was, take it from him and eliminate him. And the cold facts are that's what he did. The place is not torn up. There's no struggle. Very minimal."
 {¶ 108} While appellant cites to the fact that he did not take a weapon and that he never confessed to a plan to kill Mr. Kozlowski to support his argument, he fails to consider the remainder of the evidence presented at trial. Appellant knew that Mr. Kozlowski kept cash on the premises and that Mr. Kozlowski knew appellant and could identify him. Appellant also knew Mr. Kozlowski's general age and condition. From this evidence, and the injuries caused to Mr. Kozlowski, a reasonable jury could infer that appellant planned to rob and kill Mr. Kozlowski before going to his home that evening. The prosecutor's statement was a fair comment on a reasonable inference that could be drawn from the evidence. Appellant's seventh assignment of error is not well-taken.
In his ninth assignment of error, appellant contends that the prosecutor improperly stated in his rebuttal closing arguments, without supporting evidence, how he believed that the crime occurred. The prosecutor stated that:
 {¶ 109} "Now, we don't know what happened in that house on that evening. Only the killer would actually know that. And we know what Troy Tenace told the police on that — the 31st. But I submit to you that he entered the house, as a possible scenerio [sic], he demanded the money from Mr. Kozlowski. Mr. Kozlowski said no, I'm not giving you my money, and he said, Get out or I'm going to call the police. He goes over to pick up the phone. That's when the phone cord is pulled out. He said he didn't want him making noise so it would attract attention from the neighbors. He certainly didn't want him to pick up the phone and leave there."
 {¶ 110} We find that this comment is a fair comment on the evidence presented and the inferences that could be made based upon this evidence. Therefore, appellant's ninth assignment of error is not well-taken.
 {¶ 111} In his tenth assignment of error, appellant argues that the prosecutor improperly told jurors during voir dire that death was a mandatory sentence under some circumstances; the court erroneously used this mandatory death penalty language; and that the jury was improperly directed that the death penalty was a mandatory sentence just before the defense presented its mitigating evidence during the penalty phase of the trial. At that time the prosecutor stated that:
"It will be your duty under your oaths as jurors to make the determination that the aggravating circumstances do in fact outweigh the mitigating factors beyond a reasonable doubt. Your verdict will be mandatory, and that is that you must vote for the death sentence. Thank you."
 {¶ 112} Appellant argues that the jury should be instructed that its role is to determine whether the death penalty is an appropriate punishment for this individual. He argues that instructing the jury that death is a mandatory sentence under certain circumstances is confusing to the jury.
 {¶ 113} We find that the comments to the jury were neither misleading nor incorrect. The United States Supreme Court cases cited by appellant require that the statutory scheme for imposing the death penalty require the jury to determine whether the death penalty is an appropriate sentence for the individual defendant. In Ohio, this is done by requiring the jury to weigh the aggravating circumstances against the mitigating factors.
 {¶ 114} However, once the jury determines beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors, the statute requires that "* * * the trial jury shall recommend to the court that the sentence of death be imposed on the offender. * * *" R.C. 2929.03(D)(2). Furthermore, under R.C. 2929.03(D)(3), if the trial court finds beyond a reasonable doubt, that the aggravating circumstances outweigh the mitigating factors, "* * *, it shall impose [a] sentence of death on the offender."
Only the appellate court is required to determine whether "* * * the sentence of death is appropriate." In this sense, this court must determine whether the sentence is "* * * excessive or disproportionate to the penalty imposed in similar cases." R.C. 2929.05(A).
 {¶ 115} Therefore, we find appellant's tenth assignment of error not well-taken.
 {¶ 116} Ineffective Assistance of Counsel
 {¶ 117} In his eleventh through eighteenth assignments of error, appellant contends that his trial counsel rendered ineffective assistance of counsel. He asserts that his counsel was ineffective because they failed to object to: 1) the prosecutor's statement in opening arguments that the coroner would testify that the amount of damage inflicted upon Mr. Kozlowski was done to kill him; 2) the prosecutor's statements in closing arguments that appellant left the victim to die, that appellant stomped on Mr. Kozlowski, that appellant had a plan to kill Mr. Kozlowski, and that Mr. Kozlowski suffered massive injury; 3) the prosecutor's statement on rebuttal to appellant's closing argument as to how the crime transpired when there was no evidence to support it; and 4) the prosecutor's statements to the jury that the death penalty must be imposed under some circumstances. In addition, appellant asserts that his counsel rendered ineffective assistance when they proposed jury instructions that placed the burden of proving the mitigating factors by a preponderance of the evidence on appellant.
 {¶ 118} The right to the assistance of counsel is guaranteed under the Article 1, Sec. 10 of the Ohio Constitution and the Sixth Amendment to the United States Constitution.
Appellant bears the burden of proving that his counsel was ineffective since an attorney is presumed competent. Strickland v. Washington
(1984), 466 U.S. 668, 687-689, and State v. Lott (1990), 51 Ohio St.3d 160,174, certiorari denied (1990), 498 U.S. 1017. To meet this burden of proof, appellant must show that: (1) there was a substantial violation of the attorney's duty to his client, and (2) the defense was prejudiced by the attorney's actions or breach of duty . Strickland, supra and Statev. Smith (1985), 17 Ohio St.3d 98, 100. Prejudice is shown where there is a reasonable probability that a different result would have occurred in the case if the attorney had not erred. State v. Bradley (1989),42 Ohio St.3d 136, paragraph three of the syllabus, certiorari denied (1990), 497 U.S. 1011, and State v. Noling, 98 Ohio St.3d 44,2002-Ohio-7044, at ¶ 108, certiorari denied (2003), ___ U.S.L.W. ___, 2003 U.S. LEXIS 4353.
 {¶ 119} With respect to the allegations of ineffective assistance because counsel failed to object to certain statements made by the prosecution, we find these to be without merit. We have already discussed each of these issues under the previous section and found either that the statements were acceptable or did not alter the outcome of this case. Even though the standard of review for claims of ineffective assistance of counsel is less rigorous than for plain error, we still conclude that the prosecutor's statements, even if deemed inappropriate, did not result in prejudicial error. State v. Carpenter (1996), 116 Ohio App.3d 615,621-622. Therefore, we find appellant's eleventh through seventeenth assignments of error not well-taken. We now turn to appellant's eighteenth assignment of error where he alleges that his trial counsel rendered ineffective assistance by submitting jury instructions that placed on the defendant the burden of proving the mitigating factors by a preponderance of the evidence.
 {¶ 120} The burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death remains on the prosecution. R.C. 2929.03(D)(1). The Supreme Court of Ohio has held that the defendant bears the burden of proving the mitigating factors by a preponderance of the evidence. R.C. 2929.03(D)(1); State v.Jenkins (1984), 15 Ohio St.3d 164, 171-172, certiorari denied (1985),472 U.S. 1032; and State v. Stumpf (1987), 32 Ohio St.3d 95, 101-102, certiorari denied (1988), 484 U.S. 1079. While not overturning that holding, the court later recommended jury instructions that more closely matched the statutory language when it stated that:
 {¶ 121} "* * * [A] jury instruction that closely tracks R.C.2929.03(D)(1) and which does not place the burden of proving the existence of a mitigating factor by a preponderance of the evidence on the defendant would adequately guide a jury in its deliberations during the penalty phase of a capital trial. Further, such an instruction would ensure that Ohio jurors clearly understand that they are to consider all mitigating evidence in reaching their sentencing recommendation." Statev. Lawrence (1989), 44 Ohio St.3d 24, 27. Nonetheless, the court still upholds the jury instruction which places the burden of proving the mitigating factors on the defendant as required under R.C. 2929.03(D)(1).State v. Seiber (1990), 56 Ohio St.3d 4, 16.
 {¶ 122} Therefore, we cannot find that appellant's counsel in this case violated a substantial duty to appellant in this case by failing to submit alternative jury instructions. Appellant's eighteenth assignment of error is not well-taken.
 {¶ 123} Because the issues are interrelated, appellant's nineteenth assignment of error regarding a claim of ineffective assistance of counsel will be addressed following his twenty-second assignment of error.
Challenge of Juror for Cause.
 {¶ 124} In appellant's twentieth assignment of error, he argues that the trial court erred in dismissing Juror, Julie Vitale, over the objection of defense counsel. This juror was excused solely because she was the sister of one of appellant's defense attorneys. Appellant asserts that this error denied him his right to a jury trial guaranteed by theSixth Amendment to the United States Constitution and Article I, Section5 of the Ohio Constitution.
 {¶ 125} Section 10, Article I of the Ohio Constitution and theSixth Amendment to the United States Constitution guarantee a criminal defendant that he must be tried by an impartial jury. In a criminal case, a prospective juror may be dismissed from service when a party exercises a peremptory challenge or when a party challenges the juror for cause. Crim.R. 24(B) and R.C. 2313.42 set forth grounds upon which a prospective juror can be challenged for cause. Crim.R. 24 supersedes R.C.2313.42 only when there is a conflict between the rule and the statute. Crim.R. 1(C); State ex rel. Hurt v. Kistler (1992), 63 Ohio St.3d 307,309 overruled on other grounds by State ex rel. Steckman v. Jackson
(1994), 70 Ohio St.3d 420.
 {¶ 126} The rule does not contain a provision regarding a relative of the attorneys. However, the statute provides that a prospective juror may be challenged for cause if they are related "by consanguinity or affinity within the fourth degree, to either party, or to the attorney of either party." R.C. 2313.42(G).
 {¶ 127} Appellant relies upon State v. McKinney (1992),80 Ohio App.3d 470 and State v. Sims (1969), 20 Ohio App.2d 329 to argue that even if a challenge for cause has been made under R.C. 2313.42(G) the court may not automatically dismiss the juror. He contends that the court must make further inquiry to determine if the prospective juror is biased. In both of these cases, the courts held that a court employee cannot be presumed to be a biased juror and was required to inquire further as to the juror's bias. In the case before us, however, the challenge for cause is one of the causes listed in the statute.
 {¶ 128} We have found only two cases involving the consideration of a juror's bias when they were related to an attorney in the case. The first is State v. Keaton (1967), 9 Ohio App.2d 139, certiorari denied (1968), 390 U.S. 971. In the Keaton case, the issue of the relationship was not made known to the court until after the defendant was convicted. The juror was a distant relative of the prosecuting attorney. However, the prosecuting attorney attested that he did not know about the relationship and had never met the juror before. During voir dire, the juror denied being a relative of the prosecuting attorney. The court concluded that since the issue was not timely raised and there was no showing that the juror had been biased, the trial court did not err in failing to grant the defendant a new trial.
 {¶ 129} In the second case, State v. Pearson (Mar. 12, 1984), 12th Dist. App. No. CA-790, the court held that the wife of an assistant prosecuting attorney should been have excused for cause even though her husband was not representing the state at trial. The court distinguished the Pearson case from the Keaton case on the basis that this case involved a closer degree of relationship, the relationship was known to all the parties, and the issue was raised immediately on voir dire.
 {¶ 130} We agree with the Keaton court that the right to challenge a juror does not mean that the juror is disqualified. The final determination of whether the juror should be disqualified remains with the trial court. Bell v. The Babcock Wilcox Co. (Sept. 1, 1993), 9th Dist. App. No. 15887, at 6-7, and Richter v. Univ. Hospitals ofCleveland (May 5, 1983), 8th Dist. App. No. 45382, at 5-6 (both cases involved challenges for cause under R.C. 2313.42(E)). However, we do not hold that the trial court must make further inquiry as to the juror's bias to determine whether the juror is fair and impartial.
 {¶ 131} In the case before us, appellant has failed to demonstrate that the court's dismissal of the juror was an abuse of the court's discretion. While the court did not question the juror further, the mere fact that she was a sibling of an attorney for the defense supports the trial court's decision to dismiss her. Appellant's twentieth assignment of error is not well-taken.
 {¶ 132} Motion to Suppress
 {¶ 133} In his twenty-first assignment of error, appellant argues that the trial court erred when it denied his motion to suppress his confession to the police. Appellant contends that his confession was not voluntary when he was not informed before his interrogation began that he might be charged with a capital offense.
 {¶ 134} Appellant recognizes that the Ohio Supreme Court has previously held that a suspect does not have to be informed that he might be charged with a capital crime prior to waiving his right to counsel.State v. Garner (1995), 74 Ohio St.3d 49, 60, certiorari denied (1996),517 U.S. 1147. See, also, Colorado v. Spring (1987), 479 U.S. 564, 577, (regarding the waiver of Miranda rights). However, appellant contends that the Garner case was wrongly decided and raises the issue solely to preserve this issue for review by the Ohio Supreme Court.
 {¶ 135} Inasmuch as there is precedent on this issue from the Ohio Supreme Court, we find appellant's twenty-first assignment of error not well-taken.
 {¶ 136} Constitutional Issues
 {¶ 137} In his twenty-second assignment of error, appellant argues that the trial court erred by failing to dismiss the death penalty sentence on the grounds that it violates the 8th and 14th Amendment to the United States Constitution and Art. 1, Sec. 9 and Sec. 16 of the Ohio Constitution which prohibit the infliction of cruel and unusual punishment and bar arbitrary and unequal punishment.
First, appellant argues that Ohio's capital punishment scheme violates these constitutional provisions because it allows the death penalty to be imposed in an arbitrary and discriminatory manner; it imposes death in a racially discriminatory manner; and it violates appellant's due process rights because the death penalty is neither the least restrictive nor an effective means of deterrence. These issues have already been considered and rejected by State v. Jenkins, supra at 167-168.
 {¶ 138} Second, he argues that Ohio's capital punishment scheme violates these constitutional provisions because there are unreliable sentencing procedures. He argues that the statutory language in R.C.2929.03(D)(3) that the jury must find that "* * * the aggravating circumstances * * * outweigh the mitigating factors * * *" invites arbitrary and capricious jury decisions. He also argues that the statutory provisions regarding the consideration of mitigating factors are vague and give the jury too much discretion to ignore these factors. Finally, he cites to several articles to argue that empirical evidence is developing in Ohio to demonstrate that juries do not understand their responsibilities and apply inaccurate standards for their decision. This issue has already been considered and rejected by State v. Buell (1986),22 Ohio St.3d 124, 139-140, certiorari denied (1986), 479 U.S. 871.
 {¶ 139} Third, he argues that Ohio's capital punishment scheme violates these constitutional provisions because the scheme lacks individual sentencing when it requires that proof of the aggravating circumstances be presented along with the proof of guilt. This issue has already been considered and rejected by State v. Jenkins, supra at 173-174.
Fourth, he argues that Ohio's capital punishment scheme violates these constitutional provisions because it imposes an impermissible risk of death on capital defendants who choose to exercise their right to a jury trial. He argues that Crim.R. 11(C)(3) permits a judge, in a bench trial, to dismiss the specifications in the interest of justice regardless of the mitigating circumstances. However, there is no corresponding provision for defendants who elect a trial by jury. Appellant contends that this discrepancy is unconstitutional citingLockett v. Ohio (1978), 438 U.S. 586, 617, (Blackmun, J., concurring) asserting that it violates the holding of United States v. Jackson
(1968), 390 U.S. 570. This issue has already been considered and rejected by State v. Buell, supra at 138, and State v. Bedford (1988),39 Ohio St.3d 122, 132, certiorari denied (1989), 489 U.S. 1072.
 {¶ 140} Fifth, he argues that Ohio's capital punishment scheme violates these constitutional provisions because it requires mandatory submission of presentence investigation reports and mental evaluations if they are requested by the defendant. Appellant contends that this requirement of R.C. 2929.03(D)(1) violates his right to effective assistance of counsel and prevents him from presenting an effective case in mitigation. This issue has already been considered and rejected byState v. Buell, supra at 138.
 {¶ 141} Sixth, he argues that Ohio's capital punishment scheme violates these constitutional provisions because R.C. 2929.04(A)(7) fails to narrow the class of individuals eligible for the death penalty. He argues that the death penalty specification of R.C. 2929.04(A)(7) is merely a repetition of the elements of felony murder defined in R.C.2903.01(B). There is no additional fact that must be proven before the defendant can be eligible for the death penalty. In contrast, he contends, a defendant charged with aggravated murder, as defined in R.C.2903.01(A), can only be eligible for the death penalty if an additional R.C. 2929.04(A) circumstance is also proven. This issue has already been considered and rejected by State v. Henderson (1988), 39 Ohio St.3d 24, paragraph one of the syllabus, certiorari denied (1989), 489 U.S. 1072, and State v. Buell, supra at 137.
 {¶ 142} Seventh, he argues that Ohio's capital punishment scheme violates these constitutional provisions because the requirements of R.C. 2929.04(B), that the nature and circumstances of the offense be considered as mitigating factors, is rendered vague by the language of R.C. 2929.03(D)(1) which incorporates the nature and circumstances of the offense into the aggravating circumstances. He further argues that R.C.2929.03(D)(1) is unconstitutional on its face because it makes the selection factors in aggravation under R.C. 2929.04(A)(1)-(8) too vague. This issue has already been considered and rejected by State v. McNeill
(1998), 83 Ohio St.3d 438, 453, certiorari denied (1999), 526 U.S. 1137.
 {¶ 143} Eighth, he argues that Ohio's capital punishment scheme violates these constitutional provisions because it provides for inadequate proportionality and appropriateness review. Appellant contends that the statute fails to require the jury or three-judge panel to identify the mitigating factors thus preventing adequate information to make this comparison determination; the statute fails to identify any meaningful manner to distinguish capital defendants who deserve the death penalty from those who do not; and that the statute does not set forth procedures for determining whether the death penalty is appropriate resulting in a cursory review by appellate courts. This issue has already been considered and rejected by State v. Buell, supra at 136-137; Statev. Jenkins, supra at 175-177; and State v. Steffen, (1987),31 Ohio St.3d 111, 123-124, certiorari denied (1988) 485 U.S. 916.
 {¶ 144} Ninth, he argues that Ohio's capital punishment scheme violates these constitutional provisions because the electric chair is cruel and unusual punishment. This issue has already been considered and rejected by State v. Coleman (1989), 45 Ohio St.3d 298, 308, and Statev. Morales (1987), 32 Ohio St.3d 252, 259-260.
 {¶ 145} Therefore, we find appellant's twenty-second assignment of error not well-taken.
 VIII. International Law {¶ 146} In his nineteenth assignment of error, appellant contends that his counsel rendered ineffective assistance by failing to assert appellant's rights under international law and the Supremacy Clause of the United States Constitution.
 {¶ 147} First, appellant contends that the State of Ohio is bound by the United State's membership in the United Nations and the Organization of American States and must fulfill its obligations under the conventions created by these organizations. These conventions include the International Covenant on Civil and Political Rights ratified in 1992 (hereinafter "Covenant on Civil and Political Rights"), the International Convention on the Elimination of All Forms of Racial Discrimination ratified in 1994 (hereinafter "Convention on Racial Discrimination"), and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ratified in 1994 (hereinafter "Convention Against Torture").
 {¶ 148} With respect to the Covenant on Civil and Political Rights, appellant contends that Ohio's statutory scheme results in arbitrary and unreliable decisions and lacks individualized sentencing, which violates the guarantees of this treaty.
 {¶ 149} With respect to the Convention on Racial Discrimination, appellant contends that Ohio's death penalty statute violates the treaty because it imposes the death penalty in a racially discriminatory manner.
 {¶ 150} With respect to the Covenant on Civil and Political Rights and the Convention Against Torture, appellant contends that Ohio's death penalty violates the guarantees against unnecessary pain and suffering.
 {¶ 151} With respect to both the Covenant on Civil and Political Rights and the Convention on Racial Discrimination, appellant contends that Ohio's death penalty statute violates provisions which guarantee equal protection and due process. He argues that Ohio's death penalty statute violates these provisions because its procedures are unreliable, fail to provide for individualized sentencing, burden the defendant's right to a jury, require mandatory submission of reports and evaluations which precludes effective assistance of counsel, arbitrarily selects certain defendants who may be automatically eligible for the death penalty, and provide for a proportionality and appropriateness review which is wholly inadequate.
 {¶ 152} We have already addressed these challenges to Ohio's death penalty statute under appellant's twenty-second assignment of error and concluded that the statutory procedure does not cause these results. Therefore, Ohio's death penalty statute does not violate the guarantees of any of these treaties in the manner argued by appellant.
 {¶ 153} With respect to the violation of international law, generally, other courts have also addressed and rejected claims that the Ohio death penalty statute violates international law and the Supremacy Clause. State v. Keene (Sept. 20, 1996), 2nd Dist. App. No. 14375, at 179, affirmed at State v. Keene (1998), 81 Ohio St.3d 646, 669, certiorari denied (1998), 525 U.S. 936; State v. Twyford, III (Sept. 25, 1998), 7th Dist. App. No. 93-J-13, at 143-144, affirmed (2002),94 Ohio St.3d 340; Greer v. Mitchell (6th Cir., 2001), 264 F.3d 663,691, certiorari denied (2002), 535 U.S. 940 (the court held that until the United States Supreme Court holds that the death penalty violates the Supremacy Clause because it has signed numerous international agreements, it would continue to deny relief on this ground); Coleman v.Mitchell (6th Cir., 2001), 268 F.3d 417, 443, fn. 12, certiorari denied (2002), 535 U.S. 1031 (the United States is not a part to any treaty that prohibits capital punishment); and Jamison v. Collins (U.S.D.C. S.D. Ohio W.D., 2000), 100 F. Supp.2d 647, 759-767, affirmed (6th Cir., 2002),291 F.3d 380. See, also, United States v. Martinez (U.S.D.C. for Puerto Rico, 2000), 106 F. Supp.2d 311, 313, fn. 6, reversed on other grounds (1st Cir., 2001), 252 F.3d 13. Appellant has failed to cite to any case in support of his position regarding these specific treaties.
 {¶ 154} Second, appellant argues that the obligations under the International Covenant on Civil and Political Rights, the International Convention on the Elimination of All Forms of Racial Discrimination, and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment are not limited by the reservations and conditions placed on these conventions by the Senate. He argues that the Senate does not have the power under the United States Constitution to adopt a treaty with reservations, but only to advise and consent. Furthermore, he contends that the Vienna Convention on the Law of Treaties further restricts the Senate's power to impose reservations and prohibits a reservation which is inconsistent with the purpose of the treaty, which is to protect the right to life.
 {¶ 155} Appellant also contends that the Senate lacks the power under the United States Constitution to declare a treaty to be not self-executing. Therefore, the Senate's declaration that the International Covenant on Civil and Political Rights is not self-executing is unconstitutional. Instead, he argues, the issue of whether a treaty is self-executing must be determined by the judiciary.
We need not address either of these issues because none of the treaties cited by appellant ban the death penalty. In addition, we have addressed the specific claimed violations of the treaties under appellant's twenty-second assignment of error and found that they lacked merit. Therefore, the issue of whether the could be adopted with reservations or are self-executing are irrelevant.
 {¶ 156} Finally, appellant contends that Ohio's death penalty statute violates customary international law. He argues that the Universal Declaration of Human Rights is an authoritative statement of the international community. He contends that Ohio's death penalty statute violates the declaration's guarantees of equal protection, due process, right to life, and protection against torture or cruel, inhuman or degrading punishment.
 {¶ 157} Appellant also contends that the following other declarations and conventions adopted by the United Nations and Organization of American States codify customary international law: The American Convention on Human Rights, the United Nations Declaration on the Elimination of All Forms of Racial Discrimination, The American Declaration of the Rights and Duties of Man, Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman, or Degrading Treatment, Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty, and the Second Optional Protocol to the Covenant on Civil and Political Rights. He contends that Ohio's death penalty statute violates similar guarantees under these declarations or conventions.
However, the Sixth Circuit has held that there is no customary international law prohibiting the death penalty for adult offenders.Buell v. Mitchell (6th Cir., 2001), 274 F.3d 337, 372. Accord, Jamisonv. Collins, supra at 767. Furthermore, the Ohio Supreme Court has held that the Ohio death penalty statute does not violate the American Declaration of the Rights and Duties of Man. State v. Issa (2001),93 Ohio St.3d 49, 69, and State v. Phillips (1995), 74 Ohio St.3d 72,103-104.
 {¶ 158} We conclude that appellant has failed to prove the second part of the Strickland test that his counsel's failure to raise this claim caused prejudice to his case. See, State v. Keene (1998),81 Ohio St.3d 646, 668. Appellant has failed to cite to any authority to support his argument that these specific international laws ban the use of the death penalty under Ohio's criminal justice system. Even if any treaty did so, appellant has failed to cite to any authority to support the argument that the agreement is binding on our court. Appellant's nineteenth assignment of error that his counsel rendered ineffective assistance by failing to assert claims of a violation of international law is not well-taken. IX. Independent Review.
 {¶ 159} Having rejected all of appellant's assignments of error and confirmed appellant's conviction, we now turn to fulfillment of our statutory duty to independently review the sentencing phase of appellant's trial and determine whether the evidence supports a finding of the aggravating circumstances, whether the sentencing court properly found that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, whether the aggravating circumstances do outweigh the mitigating factors beyond a reasonable doubt; and whether the death sentence is appropriate. R.C. 2929.05(A). We determine whether a sentence is appropriate by determining whether it is excessive or disproportionate compared to other death penalty cases. Id. When reviewing the aggravating circumstances, we must consider only the statutory requirements for classification of a crime as a capital crime and not the nature and circumstances of the crime. State v. Wogenstahl
(1996), 75 Ohio St.3d 344, paragraphs one and two of the syllabus, andState v. Nields (2001), 93 Ohio St.3d 6, 40. Within appellant's first and second assignments of error, he raised several issues related to the trial court's sentencing and our independent review of the sentencing phase of the trial.
 {¶ 160} The aggravating circumstances in this case were that appellant was the principal offender in the aggravated murder of Mr. Kozlowski during the commission of an aggravated robbery of Mr. Kozlowski. We find that there was sufficient evidence to support a finding that all of the aggravating factors were proven beyond a reasonable doubt.
 {¶ 161} However, appellant contends that the trial court improperly weighed the aggravating circumstances because it did not take into consideration the level of aggravating circumstance involved. Appellant argues that the aggravating factor in this case, being a principal offender who committed aggravated murder during the course of an aggravated robbery, is the least among the possibilities under R.C.2929.04(A).
Appellant does not cite any authority to support his position, and we cannot find any such authority either. Nonetheless he contends that the jury and trial court should have considered, and that this court on its independent review should consider, this fact.
 {¶ 162} The classification of certain offenses as being eligible for the death penalty is derived from the belief that "`* * * certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.'" State v. Jenkins
(1984), 15 Ohio St.3d 164, 168, citing Gregg v. Georgia (1976),428 U.S. 153, 184. Therefore, we find that the offenses listed in R.C.2929.04(A) are fungible and should not be ranked. The aggravating circumstances involved in this case are to be given the same weight as any other aggravating circumstance under R.C. 2929.04(A).
 {¶ 163} Ohio statutes allow the defense to present evidence of seven mitigating factors. R.C. 2929.04(B)(1)-(7). The defendant bears the burden of going forward with evidence of the factors of mitigation, but the burden of proving, by proof beyond a reasonable doubt, that the aggravating circumstances are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death remains on the prosecution. R.C. 2929.03(D)(1).
 {¶ 164} R.C. 2929.04(B) provides that when determining whether or not to impose a death penalty, the jury "shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:
"(1) Whether the victim of the offense induced or facilitated it;
 {¶ 165} "(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;
 {¶ 166} "(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform his conduct to the requirements of the law;
 {¶ 167} "(4) The youth of the offender;
 {¶ 168} "(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;
 {¶ 169} "(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;
 {¶ 170} "(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."
 {¶ 171} The nature and circumstances of the offense appellant committed do not carry any weight in mitigation. We agree with appellee that there is nothing mitigating about the fact that appellant selected his victim, gained entry to the victim's home by subterfuge, and then returned to the victim's home in order to rob him and beat the victim to death.
 {¶ 172} Appellant presented extensive testimony of his family members and a psychologist to explain his history, character, and background, which deserve some weight in mitigation.
Appellant's mother, a child of abuse and a runaway, married appellant's alleged father at a young age. His parents divorced when he was two years old. His father never accepted him because he did not believe that appellant was his son. Before appellant was six years old, he and his siblings had been kidnaped by their father and moved to New York and then by their mother and moved back to California. The children were shuffled back and forth between the parents. The children never lived in one place for longer than a year at most.
 {¶ 173} While the children were living with their mother in California, appellant saw his mother be physically abused by her second husband and was forced to watch him sexually abuse appellant's sister. Appellant was abused by one male babysitter. His sister testified that her mother sold appellant to men for prostitution. His sister described their childhood as being very bad and could recall only a few family celebrations. Appellant's brother testified that he and his siblings began stealing when appellant was 6 years old. They also began abusing drugs and sniffing glue at a young age.
 {¶ 174} When appellant was 8, the family moved back to New York to be near the children's father who had remarried. When appellant's mother lived in New York, she worked long hours and became addicted to pain medication and sleeping pills. While she was living in Florida for a time, appellant and his brother fended for themselves by stealing. Both appellant's father and the men involved in his mother's life wrongly influenced the children. When appellant was approximately 12 years old, his mother's third husband led the family in a life of stealing, counterfeiting, drinking alcohol, and using illicit drugs. All of the family members were eventually arrested.
 {¶ 175} Appellant was placed in a children's home when he was 17. He met his ex-wife while in prison, married her at age 26, and had a son before divorcing her. Appellant's sister testified that she cares for appellant's son, who was approximately 10 years old at the time of the second trial. After appellant divorced his wife, he returned to live with his mother. While he was described as a loving and committed parent, he was unable to meet his responsibilities as a parent because of his drug addiction.
 {¶ 176} Appellant was involved in several drug abuse treatment programs, but none of them were effective. Although appellant's sister had started to overcome her problems at the time of appellant's first trial, she was incarcerated by the time of appellant's second trial. Likewise, appellant's brother was also incarcerated that the time of appellant's second trial. He had been imprisoned for 15 of the last 20 years. He had never been able to stop his drug abuse behavior.
 {¶ 177} In summary, appellant introduced evidence that he was raised in an bizarre home filled with violence, abuse, crime, and little parental supervision. As a result, appellant, as well as his siblings, led a life of drug abuse and crime. Appellant developed severe psychological problems. None of three children were able to successfully change their lifestyle even though appellant and his sister tried to break their drug abuse behavior.
 {¶ 178} Dr. Janice Ort, a psychologist, testified that she interviewed appellant on three separate occasions over a six-month period for a total of ten hours. She also reviewed records provided to her and the statements of appellant's family gathered by a social worker. Her opinions were made knowing that she was to testify in a mitigation hearing on the death penalty for the defense. While the family history is based upon interviews with the family members who know that the information will be used in a mitigation hearing, Dr. Ort relied only upon those accounts that were common among all of the family members.
 {¶ 179} Dr. Ort diagnosed appellant with post traumatic stress disorder, a dysthymic depression disorder, and substance related disorders. Appellant was previously diagnosed with a dysthymic disorder and major depressive disorder as well as substance related disorders.
 {¶ 180} She believes that appellant's post traumatic stress disorder, an anxiety disorder, stems from the stress he suffered in childhood and adolescence. She contended that children that are traumatized during their early years do not develop skills to deal with these issues so they minimize things, deny, develop anger, abuse substances, etc. She acknowledged that other doctors did not diagnose him with this disorder even though he was evaluated in the homes where he was placed. Nonetheless, she believes that this disorder affects him 24-hours a day and interferes with his functioning as a human being. She also believed that it contributed to the murder. Because he did not have the skills to cope with life, appellant turned to substance abuse to dull the feelings and avoid life. He chose cocaine, which led to aggression and the inability to flee when challenged. However, she agreed that while the substance abuse may have contributed to the murder, it does not cause it. She also believed that the disorder prevented the drug abuse treatment programs from being successful.
 {¶ 181} Dr. Ort also testified that appellant has an anti-social personality disorder. Therefore, she would expect that he would not follow the rules, would repeatedly perform acts that are grounds for arrest; be deceitful; con people; act impulsively; fail to plan ahead; act in an unstable and aggressive manner; show a reckless disregard for the safety of himself and others; be irresponsible; and lack remorse. While there is a high correlation between anti-social disorder and criminal behavior, Dr. Ort did not believe that the anti-social disorder diagnosis explains why appellant committed murder.
 {¶ 182} Dr. Ort also testified that appellant is of average intelligence and is intellectually capable of conforming his conduct. Dr. Ort concluded that while appellant does not have a thought disorder and, therefore, knows right from wrong, he does have some problems with thinking.
 {¶ 183} The trial court found that the following evidence carried some weight in mitigation as miscellaneous factors under R.C.2929.04(B)(7): the fact that appellant had psychological problems and thinking disorders; that he loved his son and was protective of his sister; and that he had a deplorable childhood. The trial court refused to consider appellant's mental disorders as a mitigating factor under R.C. 2929.04(B)(3) because they "* * * did not cause him to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law."
Appellant contends that the trial court should have considered appellant's severe psychological problems as a mitigating factor under R.C. 2929.04(B)(3). He argues that R.C. 2929.04(B)(3) does not require a showing that the mental illness excuses the crime or that it directly caused the crime. We find appellant's argument unpersuasive. The trial court properly characterized appellant's mental disorders as a miscellaneous factor under R.C. 2929.04(B)(7). State v. Stojetz (1999),84 Ohio St.3d 452, 472, certiorari denied (1999), 528 U.S. 999, and Statev. Lawrence (1989), 44 Ohio St.3d 24, 32.
 {¶ 184} Alternatively, appellant argues that whether viewed under R.C. 2929.04(B)(3) or R.C. 2929.04(B)(7), appellant's mental disorders are severe and deserve very substantial weight in mitigation. The mitigating factors under R.C. 2929.04(B) are relevant to the sentencing phase of the trial because they demonstrate whether a particular offender should be sentenced to death. State v. Holloway (1988), 38 Ohio St.3d 239, paragraph one of the syllabus, certiorari denied (1989), 492 U.S. 925. The trial court is given the discretion to assess and weigh the mitigating evidence. State v. Steffen, supra at paragraph two of the syllabus. In this case, the trial court gave some weight to appellant's mental condition. We cannot find in this case that the trial court abused its discretion by failing to give greater weight to appellant's mental disorders. On our independent review of the mitigating evidence, we also find that appellant's mental disorders and abilities are entitled to some, but not "very substantial weight" as suggested by appellant.
Appellant also contends that the fact that appellant cooperated with the police, confessed to the crime, expressed remorse, and the fact that he would not have been eligible for parole in Ohio until he was 96 years old, should also have been given weight as mitigating evidence.
 {¶ 185} As we stated previously, the state of Ohio has designated that certain crimes are so grievous that the penalty of death is the only appropriate penalty. State v. Jenkins, supra at 168. That fact that appellant most likely will be incarcerated for the remainder of his life, does not diminish the fact that he committed a crime for which the state of Ohio permits the imposition of the death penalty.
 {¶ 186} We give little weight to the fact that appellant cooperated with the police, confessed to the crime, and expressed remorse. Appellant's arrest was achieved because others turned him in. His remorse and confession came only after his arrest.
 {¶ 187} Appellant also lists, as a mitigating factor, the fact that he sought to enter a plea in this case in exchange for life imprisonment. However, he also noted that this court has previously held that this is not a mitigating factor citing State v. Dixon (Nov. 17, 2000), 6th Dist. App. No. L-96-004, at 24-25, certiorari denied (1996),516 U.S. 1077. In the Dixon case, we held that appellant's offer to enter a plea is not relevant to whether he should be sentenced to death for the same reasons that the prosecutor's offer of a plea bargain is not relevant. We found that an offer to plead guilty is not relevant to the issue of whether the defendant took responsibility for his actions nor his "moral culpability." Upon a subsequent review of this issue, we conclude that while any amount or no weight may be ascribed to the fact that a defendant offered to enter a guilty plea, it is admissible mitigating evidence. See, State v. Hanna 95 Ohio St.3d 285, 2002 Ohio 2221, at ¶ 104; State v. Stumpf (1987), 32 Ohio St.3d 95, 106, certiorari denied (1988), 484 U.S. 1079.
 {¶ 188} We also find that the following evidence carried some weight in mitigation as miscellaneous factors under R.C. 2929.04(B)(7): the fact that appellant had little or no parental supervision and upbringing; that he was abused as a child; that he watch his family members be abused; that his family was severely dysfunctional; that he was taught by his family members how to engage in a life of crime; that both of his siblings are incarcerated because of their drug addictions; that he has strong family ties; that he loves his son; that he has a history of drug abuse and that several treatment programs were unsuccessful; and that he developed severe psychological problems because of his childhood. We find that these facts merit significant weight in mitigation.
 {¶ 189} However, upon a review of all of the mitigating evidence, we find that the aggravating circumstances of this case outweigh the mitigating factors beyond a reasonable doubt. Accordingly, we find that the death sentence in this case is statutorily appropriate. Having addressed the remainder of the issues presented in appellant's first and second assignments of error, we find those assignments of error not well-taken.
 {¶ 190} Finally, we must compare the death sentence in this case to the other cases in which we have imposed the death penalty. R.C.2929.05(A) and State v. Steffen, supra at paragraph one of the syllabus. We have previously affirmed the imposition of the death sentence in cases involving aggravated murder in connection with an aggravated robbery.
In State v. Thomas (June 30, 1999), Sixth Dist. App. No. L-96-020, affirmed 97 Ohio St.3d 309, 2002-Ohio-6624, the defendant murdered an 87-year old woman during an aggravated robbery. As in the case before us, the defendant in that case had known the woman because he had done odd jobs for her in the past and had attempted to borrow money from her. We affirmed the death penalty despite evidence in mitigation that the defendant had been raised in a rural, impoverished family, dropped out of school in the seventh grade, his father was purportedly an alcoholic, one of his brothers was killed by his father in self-defense, he had a long history of drug and alcohol abuse, and he was mildly retarded.
 {¶ 191} In State v. Smith (Feb. 6, 1998), Sixth Dist. App. No. L-94-093, affirmed (2000), 89 Ohio St.3d 323, the defendant was convicted of committing murder during the course of an aggravated robbery. We affirmed the death penalty despite evidence in mitigation that the defendant suffered a difficult childhood and alleged that he suffered from a mental defect which prevented him from conforming his conduct to the dictates of the law.
 {¶ 192} In State v. Baston, (Sept. 12, 1997), Lucas App. No. L-95-087, affirmed (1999), 85 Ohio St.3d 418, certiorari denied (1999),528 U.S. 1049, the defendant was convicted of committing murder during the course of an aggravated robbery. We affirmed the death penalty despite evidence in mitigation that the defendant suffered an abusive childhood.
 {¶ 193} In State v. Montgomery (Aug. 12, 1988), Sixth Dist. App. No. L-86-395, affirmed (1991), 61 Ohio St.3d 410, certiorari denied (1992), 502 U.S. 1111, the defendant killed two women in the course of an aggravated robbery. We affirmed the death penalty despite evidence in mitigation that the defendant had experienced a "bizarre childhood environment" and was mentally ill but legally sane.
 {¶ 194} In State v. Esparza (Aug. 22, 1986), Sixth Dist. App. No. L-84-225, affirmed at (1988), 39 Ohio St.3d 8, certiorari denied (1989),490 U.S. 1012, the defendant shot and killed a carry-out employee during the course of a robbery. We affirmed the death penalty despite evidence in mitigation that the defendant had led a chaotic, disruptive childhood, was abused by his father and had a diagnosed anti-social personality disorder. In State v. Clark (Dec. 24, 1986), Sixth Dist. App. No. L-84-443, affirmed (1988), 38 Ohio St.3d 252, certiorari denied (1989), 489 U.S. 1071, the defendant shot and killed a gas station attendant during a robbery. We affirmed the death penalty despite evidence in mitigation that the defendant's father had died when the defendant was young, that he had little discipline as a child, that he had low intelligence, and that he committed aggravated robberies to support a drug habit.
 {¶ 195} Having reviewed other cases of our court in which we have affirmed the death penalty, we find that the imposition of the death penalty in this case is neither excessive nor disproportional to these other cases.
 {¶ 196} Having found that the Lucas County Court of Common Pleas did not commit error prejudicial to appellant, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant has an automatic appeal to the Ohio Supreme Court pursuant to R.C. 2929.05. For that reason we order the clerk of this court to file a copy of this opinion with the clerk of the Ohio Supreme Court within fifteen days of the issuance of this opinion in accordance with R.C. 2929.05(A). We further order a continuance of the stay of execution of sentence previously granted by the Lucas County Court of Common Pleas pending appeal to the Ohio Supreme Court. Costs to abide final determination by the Supreme Court of Ohio.
 JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Peter M. Handwork, P.J., Richard W. Knepper, J., and Mark L.Pietrykowski, J., CONCUR.